THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CLARENCE TROTTER, Defendant-Appellant.

First District (3rd Division)   No. 1—88—3793

Opinion filed September 15, 1993.

Randolph N. Stone, Public Defender, of Chicago (Anna Ahronheim, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Maureen A. Harton, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CERDA delivered the opinion of the court:

Codefendants Clarence Trotter, Michael Tillman, and Steven Bell were charged with murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1) and other offenses in connection with the July 1986 death of Betty Howard. Prior to Trotter's trial, Tillman and Bell were tried in a severed bench trial. Bell was acquitted of all charges, and Tillman was convicted of murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(1)), aggravated criminal sexual assault (Ill. Rev. Stat. 1985, ch. 38, par. 12—14(a)(2)), and aggravated kidnapping (Ill. Rev. Stat. 1985, ch. 38, par. 10—2(a)(3)). On appeal, this court reversed Tillman's convictions and remanded his case for a new trial.

After a jury trial, Trotter was convicted of murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(1)), aggravated criminal sexual assault (Ill. Rev. Stat. 1985, ch. 38, par. 12—14(a)(2)), aggravated kidnapping (Ill. Rev. Stat. 1985, ch. 38, par. 10—2(a)(3)), residential burglary (Ill. Rev. Stat. 1985, ch. 38, par. 19—3), and theft (Ill. Rev. Stat. 1985, ch. 38, par. 16—1). The jury declined to recommend the death penalty, and the trial court sentenced defendant to natural life imprisonment for murder and 15 years' imprisonment for residential burglary to be served concurrently.

On appeal, defendant asserts that the trial court erred (1) in denying his motion to suppress his statements; (2) in denying his constitutional right to represent himself at trial when he filed a motion to

proceed as co-counsel; and (3) in limiting his attorney's attempts to present all the circumstances surrounding his alleged confession. In addition, defendant asserts that he was denied a fair trial (1) when the State introduced a witness' damaging out-of-court statements, but barred the defense from introducing the witness' inconsistent out-of-court statements; (2) by prosecutorial misconduct in closing argument; and (3) by the cumulative effect of the trial errors. Finally, defendant asserts that he must be granted a new hearing on his *pro se* motion for a new trial. We reverse and remand.

A key issue in this case is whether, after defendant invoked his right to an attorney, the investigating officers and the assistant State's Attorney violated that right under all the circumstances.

Before trial, defendant filed a motion to proceed as co-counsel. Before setting a date for a hearing on that motion, the trial court informed defendant that he could represent himself or be represented by counsel, but nothing in between. The record does not indicate if that motion was ever argued or decided, but defendant proceeded with counsel.

During defendant's motion to suppress statements, defendant asked to question Detective Ollie Brownfield, arguing that he had a constitutional "right to defend in person and in counsel." When the trial court refused, defendant asked to represent himself, but subsequently proceeded with counsel.

Prior to trial, defendant moved to suppress his custodial statements on the basis that they were involuntarily made and made in violation of his right to counsel during custodial interrogations. The motions were denied.

At trial, Eddie Howard, Jr., the victim's son, testified that his mother had lived at 2860 East 78th Street, apartment 5E, in Chicago with her two-year-old son, Myron. Eddie last saw his mother on Saturday, July 19, 1986. The next day, she and Myron were expected at a picnic for Myron's birthday. When they did not show up by 4 p.m., Eddie and his fiancee, Rose Vontrese, drove to the victim's apartment. When they arrived, the victim's car was not in the parking lot.

Tillman, who was the building janitor, let Eddie and Rose into the building. Eddie used his own key to enter his mother's apartment, where he saw the contents of her purse strewn on the couch. Neither the victim nor Myron was there and the bedroom was in disarray. Missing were the victim's keys, VCR, mixer, turntable, and equalizer. Eddie called the police. Soon after, other family members and several police officers arrived.

Chicago police officer Arnold Martinez testified that he arrived at the scene to investigate a burglary. He saw that the apartment had been ransacked and was told that the victim's car and stereo equipment were missing.

Detectives Peter Dignan and Ronald Boffo arrived at the scene around 1 a.m. on July 21, 1986. After observing the apartment's condition, they spoke to Angelita Howard, the victim's daughter. She informed the detectives that Tillman had told her that he was painting an apartment on the seventh floor at about 1 a.m. Sunday morning when he heard noises coming from apartment 7C. Dignan, Boffo, Tillman, and the victim's family went to apartment 7C.

When Dignan opened the door, the apartment was completely dark. Boffo shined a flashlight into the various rooms. In one room, there was a woman's body tied by her wrists to a wall radiator. Dignan felt the body, which was cold and stiff. He was unable to detect any pulse. The victim was wearing only a tube top that had been pulled above her breasts. She was lying on her back and her legs were spread apart. There was a piece of cloth stuffed in her mouth and another cloth tied around her head.

Assistant medical examiner Dr. Joanne Richmond performed an autopsy on July 22, 1986. She observed that the victim's wrists were both tied with ligatures, a yellow towel was stuffed in her mouth, and a gag was tied around her head. The victim was wearing a torn, bloody yellow blouse and bloody yellow tube top. Her left eyelids were bruised and swollen.

The victim had suffered a gunshot wound to the left temple. The tattooing around the wound indicated that the bullet was fired at close range but was not a contact wound. Dr. Richmond also found two stab wounds to the right side of the victim's neck, a stab wound to the right upper chest, and a stab wound on the left chest, which had penetrated the left side of the heart, causing massive bleeding in the left chest cavity.

Charles Coker, 16 years old, testified that on Saturday, July 19, 1986, he told his friend, Boris Flowers, also known as A-Shay, that he needed a gun. The next day, Coker, nicknamed Bobo, and A-Shay went to a white house at 69th and Chappel Streets, Chicago, where A-Shay introduced Bobo to defendant. While they were in the house's basement, defendant gave A-Shay a loaded, silver .32-caliber revolver with a brown handle. A-Shay gave the gun to Bobo, who asked if the gun was hot, e.g., if it had any murder beats on it. Defendant replied, "Don't get caught with it because you will probably catch a case."

On a table in the basement, Bobo saw a VCR, an equalizer, a camera, and some film. When A-Shay asked if he could hold the VCR and equalizer, defendant agreed. Defendant and A-Shay also discussed a red Ford Fairlane car that defendant had in his possession.

Bobo took the gun home later that day and kept it for three days. On the third day, Bobo's mother found the gun and told him to give it back to A-Shay or she would call the police. Bobo took the gun to A-Shay's house at 66th Street and Greenwood Avenue in Chicago. A couple of days later, in A-Shay's front room, Bobo saw the VCR and equalizer that had previously been in defendant's basement.

On August 9, 1986, Bobo was riding in the Ford Fairlane with Terrence, also known as Tracy Harrison, who was driving. On 51st Street, a police squad car flashed its lights and motioned for Terrence to pull over. Instead of complying, Terrence made a U-turn and drove off at a high rate of speed. After crashing into construction equipment and running, police officers caught Terrence and took him to the police station. Bobo got away. The car keys were in the ignition, the radio was missing, and a knife was found in the car. After the police took the car to the police station, a computer check of the vehicle identification number revealed that the car had been stolen in connection with the victim's murder.

Detectives Brownfield and Dignan testified about events occurring after Bobo was brought to the police station for questioning on August 10, 1986. Bobo accompanied the detectives to A-Shay's apartment, where Dignan saw stereo equipment matching the description of that taken from the victim's apartment. Dignan also found a pair of maroon-colored woman's shoes, which were later identified as belonging to the victim.

After the detectives recovered the equalizer and VCR from A-Shay's apartment, they transported A-Shay to Area 2, were he was questioned. Subsequently, A-Shay gave the detectives the gun used to murder the victim. The parties stipulated that the .32-caliber spent bullet recovered from the victim's skull was compared with the gun. Robert Smith, an expert in firearms identification and comparison, determined that the bullet taken from the victim's skull had been fired from the gun that A-Shay gave the police.

According to Brownfield, A-Shay then directed them to defendant's house because defendant had given A-Shay the gun. Jerry Brown, who is defendant's brother-in-law and the owner of the two-flat building where defendant rented a basement apartment, let in Brownfield and Detective Raymond Madigan. Brown summoned defendant from the basement by stomping on the floor. It was dis-

puted whether defendant gave the police consent to search his room. Defendant's motion to quash arrest and suppress evidence was denied, and the trial court found that defendant validly signed a consent to search form.

The detectives and defendant went to the basement, where Brownfield searched defendant's room. During the search, Brownfield saw a stereo mixer fitting the description of the victim's stolen mixer. He also saw camera equipment, but did not know at the time that camera equipment had been taken from the victim's apartment.

Defendant was taken to Area 2. Madigan advised defendant of his *Miranda* rights. Defendant told the police that he had bought the stereo mixer from someone on the street and denied any knowledge of the items found in A-Shay's house.

After the detectives told defendant that Bobo had first seen all three items in defendant's basement, Bobo confronted defendant, telling him in the presence of the detectives that he had told them "everything about the stuff." After this confrontation, defendant admitted knowledge of the equalizer and the VCR, stating that he had bought these items and the mixer from two guys on 71st Street. Defendant continued to deny any knowledge of the gun.

Defendant was shown five photographs, including those of codefendants Bell and Tillman. Defendant was unable to identify any of the photos. Defendant was then given several photograph books from which to identify the two men from whom he bought the victim's belongings. After a couple of hours, defendant identified a photograph. Brownfield was able to determine that the individual in the photo had been convicted and sentenced for an unspecified offense, but he was unable to promptly determine whether the person was still incarcerated.

At 8:30 a.m. the next day, Brownfield learned that the person identified by defendant had been in prison at the time of the murder and could not have sold the stereo equipment to defendant. Defendant was then given a polygraph examination and returned to Area 2 shortly after noon on August 11, 1986.

A short-time later, Brownfield and Madigan went into the interview room where defendant had been placed and told him that he was under arrest for Betty Howard's murder. They also told him that ballistics had confirmed that the gun he had given A-Shay was the murder weapon and that his fingerprints were found at the scene. Defendant stated that he wanted to call his attorney.

Defendant was allowed to use the telephone, but reached only his attorney's secretary. At about 5 p.m. that afternoon, defendant spoke

to his attorney on the telephone. The attorney indicated that he would be at Area 2 before 9 p.m. that night. Defendant told the detectives that he would speak to them after he spoke to his attorney. He was then left alone in the interview room.

Madigan testified that he gave defendant his *Miranda* rights around 1 p.m. on August 11, 1986, at Area 2 and defendant requested an attorney. Madigan allowed defendant to call his attorney, whom he spoke to around 5 p.m. Defendant was then taken back to the interview room. At 9 p.m., Madigan went into the interview room where Detective Lawrence Nitsche and defendant were talking. Madigan told defendant that it was 9 p.m. and his attorney was not there.

Detective Nitsche testified that defendant asked for a glass of water and to use the washroom around 7:30 p.m. on August 11, 1986. When they returned to the interview room, defendant asked Nitsche if he could sit and talk with him. Nitsche said that he could not and gave defendant his *Miranda* rights. Then, defendant stated that he did not want to talk about the case. He just wanted to talk to someone. They talked for about 1½ hours. Nitsche stated that they did not discuss this case, but defendant asserted that Nitsche was asking general questions that touched on the case.

When Madigan came to tell him it was 9 p.m., Nitsche stood up to leave the room, but defendant said he wanted to talk to him some more. Madigan left the room. Again, defendant indicated that he wanted to talk "off the record." When Nitsche again told him that he could not talk off the record, defendant said that he wanted to tell him what had happened. Nitsche readvised defendant of his *Miranda* rights. Defendant stated that he knew his rights and then made an inculpatory statement. The statement was repeated to Madigan, Brownfield, and Barbaro.

Assistant State's Attorney Barbaro testified that he arrived at the police station at 6:45 p.m. on August 11, 1986, spoke to the detectives assigned to the case, read the reports about the case, and interviewed Bobo and A-Shay, who were at the police station. Around 7:30 p.m., Barbaro went into defendant's interview room, introduced himself, advised defendant of his *Miranda* rights, and asked defendant if he wanted to talk. When defendant said he wanted to talk but not until his lawyer arrived, Barbaro "terminated the interview" and left the room.

On cross-examination, Barbaro stated that he did not ask defendant if he wanted to talk to him until after he advised him of his rights. Barbaro testified that he knew at that time that defendant was waiting for his attorney.

At about 9:20 p.m., Nitsche called Barbaro into defendant's interview room. Calling Barbaro by his first name, defendant began to ask him several questions. According to Barbaro, defendant stated that he felt his attorney was not going to appear and he wanted to talk to Barbaro. After defendant completed his statement, he agreed to make a written statement. A four-hour interview then took place.

As part of defendant's case in chief, Detective John Yucaitis testified to the contents of Michael Tillman's statement, and Assistant State's Attorney Timothy Frenzer testified to the contents of Steven Bell's statement. Neither Tillman nor Bell had mentioned defendant as a participant in the killing.

Attorney William Laws testified that defendant had called him from Area 2 on August 11, 1986. Laws returned the call around 3:30 p.m. and spoke to defendant. He told defendant not to make any statements and that he would be at the station later that evening. Laws also spoke to a police officer, but did not know his name. Laws stated that he never made it to the station that night and that he did not call to let defendant know he would not be there.

After deliberating, the jury returned guilty verdicts on the charges of murder, aggravated kidnapping, aggravated criminal sexual assault, residential burglary, and theft. Defendant was subsequently sentenced to natural life.

On appeal, defendant asserts that the trial court erred in denying his motion to suppress his statements, which were made after he invoked his right to counsel. Defendant contends that his discussion with Detective Nitsche was not an initiation of further interrogation because it had nothing to do with the investigation. Instead, it was a general conversation about unrelated issues.

Furthermore, defendant argues, the authorities twice initiated communication with him about the investigation. At 7:30 p.m., Barbaro came into defendant's interview room, introduced himself, explained who he was, gave defendant his *Miranda* warnings, and asked if defendant wanted to make a statement. Defendant refused and Barbaro left.

Shortly afterwards, defendant and Nitsche talked for 90 minutes about unrelated matters. At 9 p.m., Madigan came into the interview room and informed defendant and Nitsche that it was 9 p.m. and defendant's attorney had not yet arrived.

In response, the State asserts that defendant initiated the conversation when he asked to speak to Nitsche off the record. After speaking with Nitsche for 90 minutes, defendant agreed to make a statement about the murder. Thus, the State concludes that defendant

knowingly and intelligently waived his right to counsel and to remain silent.

Moreover, the State contends, Madigan did not initiate interrogation, but merely interrupted a conversation that had already begun between defendant and Nitsche. The State also contends that Barbaro did not initiate a conversation with defendant because he only introduced himself and gave defendant his *Miranda* rights, but did not question defendant.

The State argues that defendant made his inculpatory statement because he was sick and tired of waiting for his lawyer to arrive, not because he succumbed to the inherently compelling pressures of custodial interrogation.

Once a defendant asks for an attorney during a custodial interrogation, the interrogation must cease until an attorney is present. (*Minnick v. Mississippi* (1990), 498 U.S. 146, 150, 112 L. Ed. 2d 489, 495, 111 S. Ct. 486, 489; *Miranda v. Arizona* (1966), 384 U.S. 436, 474, 16 L. Ed. 2d 694, 723, 86 S. Ct. 1602, 1627-28.) If the interrogation continues without the presence of an attorney and a statement is taken, the prosecution bears a heavy burden to prove that the defendant initiated further communication, exchanges or conversations with the police. *Edwards v. Arizona* (1981), 451 U.S. 477, 484-85, 68 L. Ed. 2d 378, 386, 101 S. Ct. 1880, 1884-85.

The Supreme Court explained the rationale underlying the *Edwards* rule by stating:

> "[I]f a suspect believes that he is not capable of undergoing such questioning without advice of counsel, then it is presumed that any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the 'inherently compelling pressures' [of custodial interrogation] and not the purely voluntary choice of the suspect." *Arizona v. Roberson* (1988), 486 U.S. 675, 681, 100 L. Ed. 2d 704, 713, 108 S. Ct. 2093, 2097-08.

The issue is whether there was an *Edwards* violation or whether defendant's request to talk to Nitsche about issues other than the investigation was an initiation of conversation under *Edwards*. In *Oregon v. Bradshaw* (1983), 462 U.S. 1039, 77 L. Ed. 2d 405, 103 S. Ct. 2830, the United States Supreme Court discussed the type of conversation covered by *Edwards*. Inquiries by either the defendant or police relating to routine incidents of the custodial relationship are not *Edwards*-type inquiries because they do not represent a desire to open up a more generalized discussion relating directly or indirectly

to the investigation. *Bradshaw*, 462 U.S. at 1045, 77 L. Ed. 2d at 412, 103 S. Ct. at 2834-35.

After the *Bradshaw* defendant invoked his right to counsel, he re-initiated the conversation by asking a police officer, "Well, what is going to happen to me now?" (*Bradshaw*, 462 U.S. at 1043, 77 L. Ed. 2d at 411, 103 S. Ct. at 2834.) Although the question was ambiguous, it evidenced the defendant's willingness and a desire for a generalized discussion about the investigation instead of merely being a necessary inquiry arising out of the incidents of the custodial relationship. *Bradshaw*, 462 U.S. at 1045-46, 77 L. Ed. 2d at 412, 103 S. Ct. at 2835.

Defendant relies on *State v. Grant* (Me. 1990), 571 A.2d 1203, 1204, where the Maine Supreme Court ruled that the defendant's confession should have been suppressed. When that defendant invoked his right to counsel, the police stopped questioning him. After his arraignment, however, the defendant was in the lockup. A police officer approached him and asked if he was going to make bail and had gotten a lawyer. The defendant responded that he did not think he was going to make bail and that he did not want a lawyer. The officer then asked if defendant wanted to talk about the events surrounding the charge. Defendant agreed. After the officer gave defendant his *Miranda* warnings, he made an inculpatory statement. *Grant*, 571 A.2d at 1204.

The prosecution argued in *Grant* that the officer's initial questions about bail and a lawyer did not amount to interrogation. Instead, they contended that the discussion regarding the case was instigated by the defendant's remarks. Even though the court determined that the officer's initial questions did not amount to an interrogation, it concluded that the conversation took place at the behest of the officer and was not instigated by the defendant. (*Grant*, 571 A.2d at 1206.) The court held that the officer's conduct violated *Edwards* because the officer implicitly introduced the subject of further questioning when he initiated a discussion concerning the matter of representation. (*Grant*, 571 A.2d at 1206.) Although *Grant* is not *stare decisis*, it is persuasive.

■■ We find that Barbaro's inquiry to defendant about a possible statement and Madigan's statement about defendant's attorney not being present violated *Edwards*. Those statements implicitly introduced the subject of further questioning by initiating a discussion concerning the matter of representation. Furthermore, we find that defendant did not initiate a conversation about the investigation. His request to speak with Nitsche about matters unrelated to the investigation was not an *Edwards*-type inquiry because it did not represent

a desire to open up a more generalized discussion relating directly or indirectly to the investigation..

Even if there had been no *Edwards* violation, the State did not meet its burden of proving that defendant made a knowing and intelligent waiver after he invoked his right to counsel. To determine whether the purported waiver was knowing and intelligent, this court must examine the totality of the circumstances, including that the accused, not the police, reopened the dialogue with authorities. (*Bradshaw*, 462 U.S. at 1046, 77 L. Ed. 2d at 413, 103 S. Ct. at 2835.) Any waiver by defendant must be unbadgered. (*Minnick*, 498 U.S. at 150-51, 112 L. Ed. 2d at 496, 111 S. Ct. at 489.) This determination depends on the particular facts and circumstances of each case, including the background, experience, and conduct of the accused. *Edwards*, 451 U.S. at 482, 68 L. Ed. 2d at 385, 101 S. Ct. at 1884.

The conduct of Barbaro, Nitsche, and Madigan during the 90 minutes preceding defendant's purported waiver of counsel constituted coercive pressure. Instead of taking defendant to the lockup to await his attorney's arrival, the police kept him in an interrogation room where they made repeated visits.

Each conversation cannot be isolated. The totality of the circumstances must be considered to determine whether defendant's statements were improperly obtained. Once defendant invoked his right to counsel and the police and assistant State's Attorney knew that defendant had contacted an attorney who was on his way to the police station, defendant should have been taken out of the interrogation room, placed in the lockup, and left alone by the investigating officers and assistant State's Attorney. Instead, Barbaro came into the interrogation room and asked defendant if he wanted to make a statement. Then, Nitsche spent 1½ hours "shooting the breeze" with defendant. At 9 p.m., 31 hours after defendant was first placed into custody, Madigan went into the interrogation room and informed defendant that his lawyer had not yet arrived.

Even though the police only interrogated defendant once during the seven or eight hours after defendant invoked his right to counsel, they were eroding defendant's will. Defendant did not make an unbadgered waiver of counsel. We find that defendant did not make a knowing and intelligent waiver of his right to counsel. His statements were improperly obtained and should have been suppressed.

Next, defendant asserts that the trial court denied him his right to represent himself at trial when he filed a motion to proceed as co-counsel. Defendant argues that the trial court should have admonished him of his option of proceeding *pro se* with the assistance of

standby counsel. Instead, the trial court informed him that his only two choices were representation by counsel or *pro se*, not anything in between.

The United States Constitution's sixth amendment guarantees that an accused has the right to self-representation. (*Faretta v. California* (1975), 422 U.S. 806, 819-20, 45 L. Ed. 2d 562, 572-73, 95 S. Ct. 2525, 2533.) When the accused conducts his own defense, he is permitted to have the assistance of counsel (*McKaskle v. Wiggins* (1984), 465 U.S. 168, 174, 79 L. Ed. 2d 122, 131, 104 S. Ct. 944, 949), but the trial court is not required to appoint standby counsel. (*McKaskle*, 465 U.S. at 183-84, 79 L. Ed. 2d at 136-37, 104 S. Ct. at 953-54.) A defendant is not entitled to a hybrid trial where he alternates between proceeding *pro se* and being represented by counsel. *McKaskle*, 465 U.S. at 178-84, 79 L. Ed. 2d at 133-37, 104 S. Ct. at 951-54.

■ We find no error. Defendant had a right to proceed entirely *pro se* or with counsel, but the trial court had the discretion to appoint or not appoint standby counsel if defendant chose to proceed *pro se*.

Next, defendant asserts that the trial court improperly limited defense counsel's attempts to present all the circumstances surrounding his statements by limiting his cross-examinations of Brownfield, Nitsche, and Barbaro.

■ Defendant's argument is groundless. The evidence defendant sought to introduce during the cross-examination of Brownfield, Nitsche, and Barbaro was irrelevant. Thus, the trial court properly limited the cross-examination.

Defendant also argues that the trial court improperly restricted the direct examination of attorney Laws. In a sidebar during the examination, the trial court concluded that defense counsel was seeking to introduce inadmissible hearsay when she asked Laws whether he had said anything to the police officers on the telephone.

Defendant argues that defendant was offering the witness' own statement, which was not hearsay, that Laws had instructed the police officer not to interrogate defendant. Defendant maintains that the testimony was relevant as part of the totality of the circumstances surrounding the taking of his statement. Defendant concludes that the jury needed all the relevant facts regarding the inherent coerciveness of custodial interrogations.

In response, the State asserts that Laws' testimony was hearsay. Without the identity of the person to whom Laws made statements, the State argues that it had no way of verifying their reliability. To

support its argument, the State relies on *People v. Albanese* (1984), 102 Ill. 2d 54, 70-71, 464 N.E.2d 206, which it incorrectly interprets as implying that absent some independent corroboration, a witness may not testify to his own out-of-court statements even though he is subject to cross-examination.

■ We find that the trial court improperly limited Laws' direct examination. Laws' statements to the police officer about the interrogation were not hearsay and were relevant. This error, however, was harmless.

Next, defendant asserts that he was denied a fair trial when the State introduced damaging out-of-court statements by A-Shay, but the trial court barred the defense from introducing A-Shay's inconsistent out-of-court statements. Over defense objection, Officer Brownfield testified that A-Shay, who had the murder weapon in his possession, told the police that he received the gun from defendant.

The State replies that A-Shay's statement to the police merely showed the course of the police investigation and was not offered for the truth of the matter asserted. We disagree.

Although a police officer may reconstruct the steps taken in a crime's investigation and may describe the events leading up to the defendant's arrest where such testimony is necessary and important to fully explain the State's case to the jury (*People v. Simms* (1991), 143 Ill. 2d 154, 174, 572 N.E.2d 947), there is a distinction between an officer testifying to the fact that he spoke to a witness without disclosing the contents of that conversation and an officer testifying to the contents of the conversation. (*People v. Johnson* (1990), 202 Ill. App. 3d 417, 421, 559 N.E.2d 1041.) Under the investigatory procedure exception, the officer's testimony must be limited to show how the investigation was conducted, not to place into evidence the substance of any out-of-court statement or conversations for the purpose of establishing the truth of their contents. (*People v. Mitran* (1990), 194 Ill. App. 3d 344, 350, 550 N.E.2d 1258.) The police officer should not testify to the contents of the conversation (*People v. Henderson* (1990), 142 Ill. 2d 258, 303, 568 N.E.2d 1234), since such testimony is inadmissible hearsay. *People v. Gacho* (1988), 122 Ill. 2d 221, 248, 522 N.E.2d 1146.

If such testimony is presented, however, the trial court must instruct the jury that the testimony was introduced for the limited purpose of explaining what caused the police to act and that they were not to accept the statement as true. (*Simms*, 143 Ill. 2d at 174.) No such instruction was given in this trial. Thus, it cannot be presumed

that the jury's use of the evidence was limited to nonhearsay purposes.

■ The trial court erred in allowing Brownfield to testify to the contents of A-Shay's out-of-court statement without giving the jury a limiting instruction. The statement was so crucial to the State's case that its admission prejudiced defendant. Thus, we reverse defendant's conviction and remand this cause for a new trial.

Next, defendant asserts that the trial court improperly allowed hearsay testimony when it permitted Bobo to testify that A-Shay asked defendant whether he could keep the equalizer and VCR, which were proceeds of the charged crime and were found by the police in A-Shay's possession.

To compound its error, defendant argues, the trial court barred Linda Spates' testimony regarding contrary statements by A-Shay. In its offer of proof, the defense presented that Ms. Spates would have testified that she was staying with defendant from August 7, 1986, through August 10, 1986; that she was present on August 8, 1986, when A-Shay came to defendant's home; that she heard A-Shay ask defendant for money for camera equipment defendant had in his room; and that she heard A-Shay offer to sell defendant a VCR and gun that A-Shay had in his possession.

The State responds that A-Shay's out-of-court statement was not hearsay because it places defendant's statement in the proper context. Furthermore, the State asserts that defendant suffered no prejudice from A-Shay's statement because Bobo had already testified that he saw the VCR, equalizer, and camera equipment in defendant's room.

■ We find that the trial court erred when it admitted A-Shay's statements and excluded Spates' testimony. Since A-Shay did not testify at the trial and was not subject to cross-examination, the substance of his out-of-court statements was inadmissible hearsay. (*People v. Rogers* (1980), 81 Ill. 2d 571, 411 N.E.2d 223.) Furthermore, his statements are not admissible to explain the context of defendant's out-of-court statement. In addition, the jury should have been allowed to hear Spates' testimony. Credibility of the witnesses and the weight given their testimony are exclusively within the province of the jury. (*People v. Collins* (1985), 106 Ill. 2d 237, 261-62, 478 N.E.2d 267.) Since the testimony went to the heart of defendant's defense, the errors are prejudicial.

■ Finally, defendant asserts that he was denied a fair trial by prosecutorial misconduct in its closing argument. We disagree. Considering the totality of the evidence presented, it can safely be concluded

that a trial without these errors would produce no different result. *People v. Warmack* (1980), 83 Ill. 2d 112, 128-29, 413 N.E.2d 1254.

Based on the foregoing, the circuit court judgment is reversed and this cause is remanded for a new trial. In addition, the motion to suppress statements is granted.

Reversed and remanded.

TULLY, P.J., and GREIMAN, J., concur.