THIRD DIVISION
OCTOBER 31, 2007

1-05-1065

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 01 CR 10553 |
| | ) | |
| SHAKINA FEAZELL, | ) | Honorable |
| | ) | Joseph G. Kazmierski, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE CUNNINGHAM delivered the modified opinion of the court upon denial of petition for rehearing:

Following a jury trial in the circuit court of Cook County, defendant Shakina Feazell (Feazell) was convicted of first-degree murder, armed robbery, and armed vehicular hijacking and sentenced to 35 years' imprisonment with two concurrent 10-year terms. This appeal follows. Feazell now argues that: (1) the State engaged in prosecutorial misconduct by making prejudicial references to the victim's children and calling her a liar, manipulator, junkie and con; (2) the trial court erred by admitting the testimonial statements of codefendant Dion Banks, in violation of the sixth amendment confrontation clause; (3) defense counsel was ineffective for failing to request a sidebar or motion the court for a new trial after the State introduced alleged hearsay evidence; (4) she cannot be convicted of both armed robbery and aggravated vehicular hijacking because both crimes arise from one single act; and (5) defense counsel was ineffective for failing to request specific jury forms for the various instructions of murder.

BACKGROUND

The State offered the testimony of 11 witnesses to establish that the defendant knowingly participated in the armed vehicular hijacking, armed robbery and murder of Rose Newburn. For the purpose of simplicity, most of the testimony will be related in the context of the defendant's account of the events.

Shakina Feazell was 25 years old and Dion Banks was 40 years old when they met at a drug rehabilitation clinic where both were undergoing treatment. The pair began dating while undergoing treatment for their respective drug addictions. Shortly after leaving the drug rehabilitation program, both Feazell and Banks relapsed and began using illegal drugs again. Feazell testified that a few months after the relationship began, Banks began to physically abuse her. The abuse occurred especially when Banks lacked sufficient funds to purchase cocaine.

On March 23, 2001, Feazell and Banks spent the night at a friend's house. Both got high on drugs and slept overnight in a spare bedroom of the house. Feazell testified that when she awoke, Banks was gone and she was locked inside the bedroom. Feazell said that Banks locked the door from the outside and left her without a phone, food, water, or bathroom access. Banks opened the door when he returned to the house. Feazell testified that Banks informed her that they were going to Ford City Mall to get a present for Banks' niece. However, Feazell testified that she believed the two were going to shoplift items from the mall. The two traveled to the mall in a stolen Toyota Corolla; however, Feazell testified that she did not know the vehicle was stolen and that Banks previously claimed the car was owned by his uncle.

Banks drove to Ford City Mall and parked in a space next to a green Dodge Intrepid. The

2

Dodge Intrepid was occupied by Rose Newburn and her two children, five-year-old Tyrone Newburn and four-year-old Quincy Newburn. Rose Newburn was in the driver's seat while Tyrone and Quincy were sitting in the backseat. Feazell testified that after Banks parked the car, he said that the car he wanted was right there (indicating the green Intrepid occupied by the Newburn family). Banks quickly exited the Toyota Corolla and told Feazell to move over from the passenger's seat into the driver's seat of the Toyota. Feazell complied with the request. Banks then pulled out a gun, approached the Intrepid, and shouted "get the fuck out [of] the car." Feazell testified that she did not know Banks possessed a gun. As Rose Newburn was reaching into the back of the vehicle, Banks shot through the window. Tyrone Newburn, who was five years old at the time of the incident, testified that Banks reached inside the vehicle, threw his mother to the ground and shot her. Rose Newburn ultimately bled to death because a bullet punctured an artery in her thigh.

Banks then entered the Intrepid and drove away, instructing Feazell to follow him in the Toyota. Both Tyrone and Quincy Newburn were still in the backseat of the vehicle when Banks drove away from the scene. Before exiting the mall, Banks let Quincy and Tyrone Newburn out of the car. The boys ran back to where their mother lay in the parking lot. Banks and Feazell drove out of the mall in the stolen vehicles. Feazell testified that she was afraid of Banks and had no choice but to follow him in the Toyota as he told her to do. Feazell followed Banks east on 79th Street in the Toyota Corolla. Feazell stated that Banks was driving at a high rate of speed and swerved in and out of traffic. Feazell testified that she then decided to cause a car accident in the hope of attracting the police.

Feazell rear-ended a white car. Joseph Harrison and his pregnant wife Retrina Smith were

3

the occupants of the white car. Harrison testified that Banks had passed his vehicle before Feazell hit his car. After Feazell bumped into the rear of his vehicle, Harrison walked to the rear of his vehicle to inspect the damage. Harrison testified that he attempted to converse with Feazell about the damage to his vehicle but Feazell refused to open her window or respond to his questions. Banks apparently observed the accident and drove in reverse to the scene of the crash. Harrison testified that as he tried to speak with Feazell, Banks jumped out of the Intrepid and asked, "[W]hat the fuck was going on?" Harrison waved Banks off while trying to speak with Feazell, who was in the Corolla. Banks instructed Feazell to drive away and returned to his vehicle. Feazell followed Banks' directions and drove away from the scene of the crash. Harrison then returned to his vehicle and followed Feazell. Banks, Feazell, and Harrison all began to travel east on 79th Street. Harrison overtook Banks and Feazell at the intersection of 79th Street and Western Avenue. Harrison drove alongside Feazell's vehicle and began to shout at her. Banks' vehicle was on the other side of Feazell's car. Feazell ignored Harrison and began to tell Banks what Harrison just shouted at her. Harrison testified that Banks shouted "F him and pull off when the light turns green." When the light turned green, Feazell drove away and Harrison continued to follow her vehicle. Harrison testified that Banks then drove alongside his car and shot at him twice. Harrison then stopped following Feazell and drove away in the opposite direction.

According to Feazell, after Banks shot at Harrison, Banks caught up with her and asked what she was trying to do. Feazell told him that she was very nervous and Banks told her to keep up with him in traffic. Feazell testified that she continued to follow Banks as he turned into the parking lot of a liquor store. Banks exited the Intrepid, took the keys from the Toyota driven by Feazell, and

entered the liquor store, leaving Feazell in the Toyota. When Banks left the liquor store, he returned the Toyota's keys to Feazell and instructed her to continue following him. Feazell followed Banks into a gas station. Banks then handed Feazell Rose Newburn's purse and wallet, telling her to use Newburn's credit card to pay for gas. Feazell attempted to use the credit card but the transaction was declined. Feazell claims that Banks asked her if she knew of a place where he could "get rid of the [Intrepid]." Feazell told Banks that she knew of a chop shop on the west side of Chicago. Feazell testified that she did not know the location of a chop shop, but lied to Banks so she could return to that area. Feazell said she felt safer on the west side because her mother, sister, and most of her family lived in that area.

Feazell testified that Banks followed her on the expressway until he signaled her to exit. Feazell then exited the expressway at Homan Avenue. She stopped the vehicle at a vacant lot at Jackson and Lotus Avenues. Banks approached the car and instructed her to open the door. Feazell said she refused to open the door and Banks became irate. According to Feazell, she told him she was afraid to open the door because he might hit her. Feazell said she was nervous and scared and began to apologize profusely to Banks. Banks replied: "[i]f I wanted to kill you or anything, I could just shoot you through the window." Feazell then opened the car door and Banks hit her legs several times. The two then drove to her mother's house. When they arrived, no one was at home. They then went to the residence of Feazell's sister, Yolanda. Yolanda testified at trial that Feazell was smiling but appeared nervous when they first greeted each other. Yolanda stated on cross-examination that she speculated whether Feazell was "high." Feazell testified that she could not tell her sister that she was in danger because Banks was standing right next to them. Feazell testified that

Banks began to brag to Yolanda about the Intrepid, but failed to mention that the car was stolen. Banks also offered Yolanda a ride in the Intrepid, but she declined. Banks and Feazell then left Yolanda's home in separate vehicles as they had arrived.

Feazell testified that they drove to a White Castle restaurant parking lot where Banks attempted to sell Rose Newburn's cellular phone and camera. After Banks could not sell the phone, he demanded that Feazell take him to a chop shop. Feazell told Banks that a chop shop was located on Lake Street. As Banks followed Feazell through the streets, she crashed into two cars parked on the street in front of the Garfield Park fieldhouse. Feazell again alleged that she intentionally caused the car accidents to attract the police. The last car that Feazell hit flipped over and Feazell's air bag deployed. Feazell's car stopped and she crawled out of the car and lay on the pavement. Feazell testified that she was not really hurt but had a cut on her lip and a bump on her head. Steve Kelly (Kelly) was outside the Garfield Park fieldhouse when he heard the car crash. He observed children running toward the accident site and ran to the cars to offer assistance. Kelly approached Feazell and called for emergency assistance. Banks soon arrived and asked Feazell if she was okay. Kelly testified that he told Banks that an ambulance was on the way, but Banks ordered Feazell to get up and said that he was going to take her to the hospital. Kelly stated that Feazell was saying "no, no, no" as Banks picked her up. Banks then asked Kelly for directions to the nearest hospital, and both Banks and Feazell left the scene in the Intrepid.

Feazell testified that as Banks drove her away from the accident, she began to apologize for the crash. Banks began to hit her on the side of her face and then he put the gun to her head. She grabbed the gun but Banks threatened to shoot her if she did not let it go. He then stopped the car

and began to beat her. Feazell testified that after Banks beat her, he told her they were going to the Dan Ryan Woods at 87th and the Dan Ryan Expressway. At that point, the police began pursuing the Intrepid and the car slammed into a pillar. Banks fled on foot and Feazell was arrested in the car. Banks was later apprehended and arrested.

Banks was tried separately before a jury, found guilty of first degree murder and given the death penalty. He did not testify at Feazell's trial.

During Feazell's trial, the State called multiple witnesses to the stand, including Detective Edward Winstead, who testified to the following during direct examination:

"Q. What is said to Shakina Feazell at that time [during interrogation]?

A. I told Shakina Feazell that she wasn't telling the whole truth, that I talked to [Banks] and that they had gone to Ford City specifically to get a new car, that the car that they were driving had been stolen, and they had it too long, it was time to switch cars. She maintained that she didn't know the car she was in was stolen. I said he said she was there when --

MS. JOHNSON: Objection

THE COURT: Sustained.

MR. RODGERS[:] Are these things that you are telling to Shakina Feazell?

A. Yes.

7

Q. Is she responding to these things?

A. She's saying, no, I didn't know it was stolen, and I said he told me you drove–

MS. JOHNSON: Objection.

THE COURT: That's what you said to her?

THE WITNESS: Yes, sir.

THE COURT: Okay, objection overruled.

MR. ROGERS[:] Go ahead

A. I said he said that you drove him in your Chevy when he stole the car from a man in a gas station, this would be their original car, [a] Toyota at 79th and Western, about three weeks before. I said you told us you didn't know he had a gun. He said you definitely knew he had a gun.

MS. JOHNSON: Objection.

THE COURT: Overruled.

THE WITNESS: You were living with him, and I quoted him, you had seen the gun a million times. In fact, he kept it under his pillow at night.

MS. JOHNSON: Objection.

THE COURT: Overruled

MR. RODGERS[:] What does the defendant say to you?

8

A. She said, 'No, I didn't know he had the gun.' I said the other thing is you knew you were going there to car jack to get a new car, to trade cars. She said, 'No, I went there to shoplift at Old Navy store.' She said, 'No, he said he was going to get a new car,' and I said , 'How was he going to get the car?' I said, 'What would you do if you were in a car and some guy said get out and give me the car?' She said, 'I wouldn't do it.' I said, 'How about if you had a gun,' and she said, 'I would do it.' She said, 'When we got to the parking lot,' she said, 'It was a green Intrepid, and he said I'm going to take that car,' and she said he pulled over next to it, and she said, 'I saw two little boys in the back seat. I was thinking, boy, I hope they don't get hurt.' So I said, 'How were they going to get hurt?' She said, 'well, I didn't know he had a gun.' And I asked her, 'What were you going to do with the car,' and she said, 'We were going to take the car and drive to the west side and try to sell it for money for drugs'

Q. After she tells you that, did you ask her for anything?

A. She was requested [*sic*] if she would give video or at least a court-reported statement of what she just told us, and she said she would.

Q. And did she eventually give one?

A. No, she changed her mind and decided not to.

Q. One last thing, at one point, did she talk about being afraid of Dion

9

Banks?

A. The very last thing that she said, I asked her why she stayed with him. She said, 'Well, I was afraid of him.'

Q. This is after he had done what he had done?

A. Yes, that was probably the last part of our conversation.

Q. Did she say when it was that she began [to be] afraid of Dion Banks?

A. When she got to the west side.

Q. To the west side of Chicago?

A. Yes.

MR. RODGERS: Nothing further, Judge."

The jury ultimately convicted Feazell of first degree murder, armed robbery and aggravated vehicular hijacking. Feazell received two concurrent 10-year terms consecutive to a 35 year term for murder. Feazell now appeals her conviction.

## PROSECUTORIAL MISCONDUCT

Feazell first alleges prosecutorial misconduct based on certain statements made by the prosecution during the trial. After examining the posttrial motion, we find that Feazell failed to properly preserve this issue for appeal. A defendant's failure to raise an issue in a written motion for a new trial generally constitutes a waiver of that issue; however, the plain-error doctrine is applied where the evidence is closely balanced or substantial rights are affected. People v. MacFarland, 228 Ill. App. 3d 107, 118, 592 N.E.2d 471, 479 (1992). "The plain-error doctrine *** allows a reviewing

court to reach a forfeited issue affecting substantial rights in two circumstances." People v. Herron, 215 Ill. 2d 167, 178, 830 N.E.2d 467, 474 (2005). "First, where the evidence in a case is so closely balanced that the jury's guilty verdict may have resulted from the error and not the evidence, a reviewing court may consider a forfeited error in order to preclude an argument that an innocent person was wrongly convicted." Herron, 215 Ill. 2d at 178, 830 N.E.2d at 474. "Second, where the error is so serious that the defendant was denied a substantial right, and thus a fair trial, a reviewing court may consider a forfeited error in order to preserve the integrity of the judicial process." Herron, 215 Ill. 2d at 179, 830 N.E.2d at 474.

Under the plain-error test, we must see whether the evidence was so closely balanced that the jury's guilty verdict resulted from the prosecutor's comments and not the evidence presented at trial. Feazell contends that the State engaged in prosecutorial misconduct by labeling her a liar, junkie, manipulator, and con and by referencing Rose Newburn's children during its closing arguments. During the trial, the State presented evidence demonstrating that Feazell lied to the police about her identity, was a convicted shoplifter, and was an admitted drug abuser. Testimony was presented from several people who witnessed Feazell's participation in the criminal activity throughout the streets of Chicago. Feazell herself testified that she lied to the police about her identity, went to Ford City Mall to shoplift, and had a drug abuse problem. Feazell also testified that she did not have any knowledge of Banks' plans to steal Newburn's vehicle and that her fear of Banks prevented her from leaving him and notifying the police as they traveled around the city. The State's comments are supported by the evidence produced at trial, including testimony given by Feazell. Even assuming some impropriety, the evidence is not so closely balanced that the jury would have convicted Feazell

11

as a result of the prosecutor's comments and not the evidence presented at trial. Thus, the issue of prosecutorial misconduct is waived under the plain-error doctrine.

DION BANKS' STATEMENTS INTRODUCED THROUGH WINSTEAD

Feazell next contends that she was denied the right to confront Banks when his testimony was improperly allowed into evidence through Detective Winstead. At issue is whether Winstead's testimony contained improperly admitted hearsay evidence that violated Feazell's sixth amendment rights. During the trial, Winstead testified about the contents of an interrogation session he had with Feazell while she was in police custody. Winstead testified that he confronted Feazell with Banks' statements after Feazell lied about her identity, minimized her role in the crime, and denied having prior knowledge of the vehicular hijacking or Banks' possession of a gun. Over defense counsel's general objections, Winstead testified to statements given by Banks under interrogation. Feazell argues that those statements were devastating to her defense. Winstead's testimony included statements that implicated Feazell in the original theft of the Toyota Corolla, which the pair used to drive to Ford City Mall. We note that the theft of the Toyota was not at issue in the trial. There were also statements from Dion Banks alleging that Feazell knowingly participated in the vehicular hijacking of the Intrepid and had knowledge of the gun that he used in the crime. Feazell argues that she is entitled to a new trial because Winstead's testimony contained improperly admitted hearsay statements that violated her sixth amendment rights. In summary, Feazell argues that Banks testified against her through Winstead and she had no opportunity to confront Banks .

Feazell points out that the trial court erred when it allowed Detective Winstead to testify to the substantive contents of his discussion with her during interrogation because the statements

violated the confrontation clause of the sixth amendment and the precedent set by Crawford v. Washington, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004). Feazell contends that Winstead's testimony was substantive and does not qualify as a nonhearsay statement or as a hearsay exception. Feazell argues that Banks' statement was the basis for the State's theory of accountability and absent the statement, all other evidence is insufficient to prove her knowledge of Banks' actions. Feazell claims that her own admission on the witness stand and criminal history only proved that she shoplifted to support her drug habit. Without the hearsay evidence, Feazell argues the State's assertions regarding her knowledge of the crime and gun are uncorroborated by any other evidence. Feazell argues that Banks' statements were substantially prejudicial and thus denied her a fair trial.

The State argues that this issue is waived because it was not properly preserved for appeal and, in the alternative, that the statements qualify as either nonhearsay statements or hearsay exceptions. The State first argues that this issue should be reviewed under a plain-error doctrine because the defense failed to preserve the issue in a posttrial motion. Under the plain error test, the State asserts that the evidence is not closely balanced and that there was sufficient evidence at trial demonstrating how Feazell was accountable for Bank's actions. The State argues that the wide scope of Feazell's involvement was illustrated through various witnesses, including Detective Winstead's testimony. Winstead testified to the conversation he had with Feazell in which she admitted having knowledge of Banks' intent to steal the victim's car before the commencement of the crime. Winstead also testified that Feazell stated that she saw the two small boys in the victim's car and "hoped that no one got hurt," but also said that they were going to take the car and whatever was in it. Various State witnesses testified regarding Feazell's involvement in the crime throughout its

various stages. The State also argues that the evidence proves that Feazell was present during the commission of the crime without opposing or disapproving it. The State also offered evidence that Feazell accepted the contents of the victim's purse and attempted to use her credit card at a gas station. The State contends that the evidence demonstrates that this case is not closely balanced and fails to meet the requirements of the plain-error test.

The State also argues that Detective Winstead's testimony falls under the police investigation exception to the hearsay rule. The State says that Winstead's statements were used to demonstrate the progression of the investigation. The State argues that Winstead's testimony demonstrates Feazell's shift in position and properly falls under the police investigation exception.

Lastly, the State contends that Winstead's statements also are nonhearsay statements used for the purpose of showing the effect on the listener's mind (Feazell) or to show why the listener subsequently acted the way she did. The State points out that Winstead testified that prior to Feazell's being confronted with Banks' statements, she lied about her identity and minimized her role in the crimes. Feazell's shift in position and truthfulness about her involvement only occurred after she was confronted with Banks' statements. The State argues that the statements were nonhearsay statements and properly admitted at trial.

This issue is reviewed under the plain-error doctrine because it was not properly preserved for appeal in a posttrial motion. As previously stated, the plain-error doctrine allows a reviewing court to consider a forfeited issue in order to preserve the integrity of the judicial process where the error is so serious that the defendant was denied a substantial right, and thus a fair trial. Herron, 215 Ill. 2d at 178, 830 N.E.2d at 474.

14

"The Sixth Amendment's Confrontation Clause [of the United States Constitution] provides that '[i]n all criminal prosecutions, the accused shall enjoy the right ..., to be confronted with the witnesses against him.'" Crawford v. Washington, 541 U.S. 36, 42, 158 L. Ed. 2d 177, 187, 124 S. Ct. 1354, 1359 (2004). The confrontation clause applies to witnesses who bear testimony against the accused. Crawford, 541 U.S. at 51, 158 L. Ed. 2d at 192, 124 S. Ct. at 1364. Where testimonial evidence is at issue, the sixth amendment demands unavailability and a prior opportunity for cross-examination. Crawford, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374. Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually provides: confrontation. Crawford, 541 U.S. at 68-69, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374. "An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." Crawford, 541 U.S. at 51, 158 L. Ed. 2d at 192, 124 S. Ct. at 1364. However, an exception to the hearsay rule allows an officer to testify for the purpose of establishing how the investigation was conducted and cannot be used to place into evidence the substance of any out-of-court statement or conversations offered for the truth of their contents. People v. Jura, 352 Ill. App. 3d 1080, 1086, 817 N.E.2d 968, 974-75 (2004). "[T]he denial of the opportunity to cross-examine an adverse witness does not fit within the limited category of constitutional errors that are deemed prejudicial in every case." Delaware v. Van Arsdall, 475 U.S. 673, 682, 89 L. Ed. 2d 674, 685, 106 S. Ct. 1431, 1437 (1986). An otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt. Van Arsdall, 475 U.S. at 681, 89 L. Ed. 2d at 684, 106 S. Ct. at 1436.

"[A] police officer may reconstruct the steps taken in a crime's investigation and may describe the events leading up to the defendant's arrest where such testimony is necessary *** to fully explain the State's case to the jury." People v. Trotter, 254 Ill. App. 3d 514, 527, 626 N.E.2d 1104, 1112 (1993). "[T]here is a distinction between an officer testifying to the fact that he spoke to a witness without disclosing the contents of that conversation and an officer testifying to the contents of the conversation." Trotter, 254 Ill. App. 3d at 527, 626 N.E.2d at 1112-13. "Under the investigation procedure exception, the officer's testimony must be limited to show how the investigation was conducted, not to place into evidence the substance of any out-of-court statement or conversations for the purpose of establishing the truth of their contents." Trotter, 254 Ill. App. 3d at 527, 626 N.E.2d at 1113. "If such testimony is presented, the trial court must instruct the jury that the testimony was introduced for the limited purpose of explaining what caused the police to act and that they were not to accept the statement as true." Trotter, 254 Ill. App. 3d at 528, 626 N.E.2d at 1113 (1993).

An out-of-court statement may also be introduced to prove the statement's effect on the listener's mind or offered to show why the listener subsequently acted as he or she did. People v. Thomas, 296 Ill. App. 3d 489, 499, 694 N.E.2d 1068, 1075 (1998). This type of statement is not hearsay and is admissible in a trial. People v. Thomas, 296 Ill. App. 3d at 499, 694 N.E.2d at 1075.

We find that in this case, the trial court violated Feazell's right to confrontation under the sixth amendment and the precedent set in Crawford v. Washington by admitting Banks' comments into evidence through the testimony of Detective Winstead. The Supreme Court held in Crawford v. Washington that "[a]n accuser who makes a formal statement to government officers bears

16

testimony in a sense that a person who makes a casual remark to an acquaintance does not." Crawford v. Washington, 541 U.S. at 51, 158 L. Ed. 2d at 192, 124 S. Ct. at 1364. Banks' statements were garnered during his interrogation by Winstead and relayed to Feazell during her interrogation session with Winstead. Banks' statements are clearly testimonial in nature. The United States Supreme Court has clearly said that this type of statement cannot be introduced against the defendant when the defense has not had the opportunity to confront the out-of-court declarant. Crawford, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374. The out of court declarant must be confronted by the defense to yield some indicia of reliability. Crawford, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374. Banks' statements are the statements of one codefendant under the pressure of interrogation against another codefendant. Without anything more, Banks' statements bear no indicia of reliability.

Banks' statements also do not qualify under the police investigation exception because Detective Winstead testified to the *substantive* contents of the statements made during the interrogation. Although the court held in People v. Trotter, 254 Ill. App. 3d 514, 527, 626 N.E.2d 1104, 1112 (1993), that "a police officer may reconstruct the steps taken in a crime's investigation," the court distinctly held that the officer's testimony must be limited to show how the investigation was conducted and not place into evidence the substance of any out-of-court statement or conversations for the purpose of establishing the truth of their contents. Had Winstead merely stated that he confronted Feazell with Banks' statement, then he would have been within the boundaries of the exception. However, he went much further. He, in effect, placed Banks' version of the events and Feazell's alleged knowledge of those events squarely before the jury. There were also no limiting

instructions from the court. The jury was simply given Banks' version of the events through the testimony of Winstead. The substantive statements were inadmissible hearsay and should never have been allowed.

We also reject the State's contention that Bank's statements were used to prove the effect of the statements on Feazell's mind or offered to show why Feazell subsequently acted as she did. The State has failed to establish how Feazell's behavior, actions or cooperation changed after hearing Banks' statements. All the State has demonstrated is that Feazell answered questions presented to her during the interrogation process.

Feazell argues that since Dion was not subject to cross-examination, the admission of his statement violated the confrontation clause. We agree. Further, we find that the error was so serious as to deny her the fundamental right to a fair trial. Indeed, Banks' testimony was a powerful force for the State and was an integral part of their case. Thus, we find that the trial court has committed plain error under the doctrine set forth in Herron. The trial court's admission of Banks' testimonial statements against Feazell through Detective Winstead fell squarely within the ruling outlined in Herron. The statements served as direct impeachment testimony to Feazell's version of the events and severely contradicted what she told the jury. Although the State contends that this was merely harmless error, its argument is not convincing and fails to adequately address the constitutional arguments raised by Feazell in her assertion that she had a right to confront Banks. Without Banks' testimony, there was no other evidence that contradicted Feazell's version of the events. This is particularly damaging because Feazell was convicted of knowing murder and, as the State all but conceded during oral arguments, no other direct evidence was offered by the State establishing that

Feazell *knew* Banks possessed a gun.

Banks' statements were unreliable as substantive evidence because Feazell did not have the opportunity to confront him. This is the exact type of testimonial statement that <u>Crawford</u> aims to prevent from being introduced against a defendant. Banks' statement falls squarely within the four corners of <u>Crawford</u> and the admission of the statement was error. This error is such that to preserve the integrity of the judicial process, we must reverse Feazell's conviction and remand for a new trial. In light of our ruling on this issue, we need not reach the other issues raised by the defendant.

Reversed and remanded.

GREIMAN and THEIS, JJ., concur.