NO. 5-96-0288

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_________________________________________________________________

THE PEOPLE OF THE STATE OF ILLINOIS,)  Appeal from the

                                    )  Circuit Court of 

     Plaintiff-Appellee,            )  St. Clair County.

                                    )  

v.                                  )  No. 94-CF-324

                                    )

TERRON THOMAS,                      )  Honorable

                                    )  Lloyd A. Cueto,

     Defendant-Appellant.           )  Judge, presiding.

_________________________________________________________________

JUSTICE GOLDENHERSH delivered the opinion of the court:

After a jury trial, defendant, Terron Thomas, was found guilty of first-degree murder (720 ILCS 5/9-1(a)(1) (West 1992)) and aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 1992)).  Defendant was sentenced to 50 years in the Depart­ment of Corrections for first-degree murder and 15 years in the Department of Corrections for aggravated discharge of a firearm, with the sentences to run concurrently.  On appeal, defendant contends that (1) the trial court erred in allowing into evidence numerous hearsay statements, (2) the trial court erred in denying defendant's motion for a mistrial on the basis that two of the jurors read or heard of a newspaper article that reported that one of the victims, Kimberly Stewart, was a judge's niece and that defendant's coconspirator had already been convicted of the murder of the other victim, Mitchell Lofton, (3) the trial court erred in denying defendant's motion for a new trial, based on the fact that one of the jurors failed to disclose that she knew defendant's mother, an announced witness at trial, and (4) the trial court erred in denying defendant's motion to dismiss because the delay of one year between defendant's indictment and arraignment violated defendant's sixth amendment right to a speedy trial (U.S. Const., amend. VI).  We affirm.  

FACTS

On November 9, 1993, the victims, Mitchell Lofton and his girlfriend, Kimberly Stewart, were each shot several times by two gunmen, identified by Kimberly as Julius Phillips, also known as "Hobo", and defendant.  Mitchell died at the scene, but Kimberly recovered from her wounds after spending two months in a hospital.  On April 21, 1994, defendant was charged with the above-mentioned offenses, and an arrest warrant was issued.  On May 27, 1994, defendant was indicted on the same two offenses.  The warrant was served on defendant on June 6, 1995.  Defendant was apparently incarcerated in Missouri beginning in March 1994 and was extradit­ed to Illinois on June 6, 1995, when the arrest warrant was signed.  Prior to trial, defense counsel filed a motion to dismiss on the ground that defendant was denied his right to a speedy trial because the East St. Louis Police Depart­ment knew or should have known defendant's address or whereabouts and the delay between his charging on April 21, 1994, and subse­quent arrest and arraign­ment on June 8, 1995, was due solely to the negligence of the State of Illinois.  After an evidentiary hearing on this motion, the trial court denied the motion to dismiss.  The trial commenced on February 5, 1996.  

At defendant's trial, Kimberly testified that she and Mitchell dated since 1991.  By November 1993, the two were living together in St. Louis and had a son.  Kimberly knew both Hobo and defendant and saw them on a regular basis.  Hobo's brother, Andre Phillips, was the boyfriend of Kimberly's sister, Monica Stewart.  Andre was also the best friend of the victim, Mitchell.  Hobo's other brother, Craig, dated Kimberly's other sister, Janine.  Hobo's sister, Rekinda, dated defendant.  Thus, all the parties in this case were somehow connected to the Phillips family.  All of these people socialized together, usually at the home of Monica Stewart.  Kimberly estimated that she saw defendant every other day for the previous three years; however, Kimberly knew defendant only as "Terry."  She did not know where he lived.  

Mitchell was a known drug dealer, and the crimes in question apparently arose over drug money.  At approximately 6 p.m. on the date in question, Kimberly and Mitchell were driving in Kimberly's car heading east on Interstate 70 from St. Louis to East St. Louis to pick up Kimberly's son.  They saw defendant and Hobo in a small white four-door car coming onto the Kingshighway exit.  Hobo motioned for them to pull over to the side of the road.  Mitchell then got out of the car and talked with defendant and Hobo.  When Mitchell returned to Kimberly's car, he told her that Hobo and Terry were going to follow them to East St. Louis.  Mitchell then drove Kimberly's car to Michael Hodges' house.  Hodges was Mitchell's brother.  Mitchell spoke with defendant, Hobo, and  Hodges.  Mitchell also visited his aunt, who lived next door to Hodges.  

Sonetta Bland, Hodges' girlfriend, testified at trial that she was present when Mitchell stopped by Hodges' home.  She saw two cars at that time, the car Kimberly and Mitchell occupied and a white car with Missouri plates.  The white car was behind the car Mitchell and Kimberly occupied and was occupied by two males.  Bland testified that Mitchell drove away in the white car with its two other occupants and that Kimberly followed in her car.

Kimberly testified that when Mitchell returned to the car, he told her that he was going to his mother's house, that Hobo and defendant wanted him to ride with them, and that Kimberly should follow.  Kimberly followed the car in which defendant was an occupant until it stopped in Jones Park in East St. Louis.  Hobo was driving, defendant was seated in the passenger side, and Mitchell was in the back seat of the car.  Kimberly saw all three exit and go to the rear of the vehicle.  Kimberly thought Mitchell was going to reenter her vehicle, so she slid to the passenger side of her car.  She then heard either defendant or Hobo say, "Give it up."  She saw Hobo and defendant pull out handguns and heard four gunshots.  She saw flashes come from the guns held by both Hobo and defendant.  Kimberly estimated she was a half a car length away when the shooting occurred.  Kimberly testified that after Mitchell was shot, defendant came to the driver's side of her car and started shooting at her.  She crouched down on the passenger side of the car and tried to cover herself, but defendant kept shooting.  She was shot 12 times.  She heard Hobo say, "Come on, come on Man, she's dead."  She heard four more shots, and then Hobo and defendant left in the white car.  

After her attackers left, Kimberly started her own car and tried to drive away.  She did not see Mitchell.  She lost control of the car and ran into a hole.  A man she did not know came to the car and said he would get her help.  She was bleeding profusely and thought she was going to die.  Two women came up to the car, retrieved her purse, and took it to her grandmother's house.  Kimberly testified that she told the emergency medical workers who came to the scene that Hobo and Rekinda's boyfriend shot her.  An ambulance then took her to the hospital, where she remained for two months.  She had bullet wounds from her breasts down to her thighs.  The police interviewed her at the hospital.  In April 1994, she went to the East St. Louis police station and talked to Detective Delbert Marion.  She was shown approximately 125 photographs and picked out defendant as one of her assailants.

Monica Stewart testified that she knew defendant and saw him on almost a daily basis.  Monica testified that she gave the police Hobo's real name and address on the day of the murder.  She did not give the police defendant's name until April 7, 1994, when she mistakenly thought defendant was one of four men following her.  Monica also testified that Kimberly had tubes in her mouth for the first week she was in the hospital.  Within a week, the tubing was removed, and Kimberly told Monica that Hobo and defendant did it.  On cross-examination, she testified that she did not tell Officer Lenzie Stewart, the officer originally investigating the crime, that her sister had now named defendant as a suspect, because Officer Stewart was out of town.  She did, however, tell Sergeant Anderson of the East St. Louis Police Department.

Dr. Harry Parks, a pathologist, found 11 bullet wounds in Mitchell's body.  He recovered three bullets from inside the body.  Dr. Parks testified that the cause of death was two gunshot wounds to the head.  

Patricia Johnson, a crime-scene technician, testified that when she arrived on the scene, she found Mitchell lying in a vacant lot approximately 200 feet from Kimberly's car.  The car's driver's side window was shot out, and there was blood on the inside.  Numerous casings and bullets were recovered at the scene.  At the morgue, Johnson retrieved approximately $3,200 in cash, which was stuck deep into the right pocket of Mitchell's jacket.

On April 13, 1994, Officer Aubrey Keller of the East St. Louis Police Department interviewed Kimberly about the November 9, 1993, shooting.  Detective Delbert Marion was also present at the time.  When the interview started, defendant was not a suspect.  Kimberly was shown approximately 125 color photographs and was asked if any of these men were involved in the shooting.  According to both Keller and Marion, Kimberly picked out defendant's photograph and said she was absolutely certain he was the shooter.  Six days prior to the photo identification, Monica Stewart reported that she thought defendant had been following her.  Monica later pointed out defendant's home in East St. Louis.  During the cross-examination of Detective Marion, he testified that his written report contained information reported to him by Kimberly that defendant shot into the car window on the passenger side and that Hobo shot at her through the driver's side.  

Because the case remained unsolved, the Violent Crimes Task Force was contacted to assist the East St. Louis Police Department in the investigation.  Specifically, Craig Koehler, an agent with the Illinois State Police, Internal Investigations, was brought in to assist in the investigation.  He interviewed Kimberly and retraced the route she traveled with Mitchell on the day of the shooting.  Koehler testified that initial police reports listed the name "Hobo" as a suspect, while the name "Terry" as a potential suspect did not arise until a week after the shooting.  According to Koehler, Kimberly told him she was always certain defendant was one of the two men involved, but she was not certain that his name was Terry.  The information he gathered from those people who original­ly arrived on the scene was that a person named "Hobo" shot her.  

Lenzie Stewart, an East St. Louis police officer who was the original detective on the case, testified that two suspects were developed during his initial investigation.  On the night of the shooting, the emergency medical technician (EMT) who took Kimberly to the hospital notified him that Kimberly reported that a person named "Hobo" was the assailant.  Detective Stewart went to the hospital to attempt to interview Kimberly on the night of the shooting, but once there he made no effort to talk to her; he stated, "[I]t was apparent to me that she was laboring for her life."  In time, Janine Stewart gave Detective Stewart enough information for him to deter­mine Hobo's real name and whereabouts.  Hobo was arrested on December 9, 1993.  On November 17, 1993, Detective Stewart interviewed Kimberly at the hospital, at which time she was in critical condition and on medication.  She identified the other assailant as "Terry."  She identified "Terry" as Rekinda's boyfriend.  Detective Stewart testified that Kimberly was uncertain only of defendant's real name, not of defendant's identity or of his involvement in the instant crimes.  

Rekinda Phillips testified at trial that defendant was her former boyfriend and the father of her daughter and that Hobo is her brother.  Rekinda stated that on November 9, 1993, defendant and Hobo were at her house in St. Louis.  Defendant left her house around 7:15 p.m., and Hobo remained there another 30 to 45 minutes.  Rekinda left her home at approximately 8 p.m.  Rekinda testified that she knew Kimberly, Monica, and Janine Stewart and that all three knew where she lived with defendant.  She also testified that Monica knew that her baby's name was Brandy Thomas.  However, at trial, Monica Stewart denied knowing Rekinda's baby's name.  Rekinda also stated that Monica knew defendant's name and knew where defendant and Rekinda lived because she dropped Rekinda off at her house.  Rekinda further testified that Kimberly was with Monica on at least a few occasions when Monica took Rekinda to the house.

Defendant presented evidence that he was incarcerated in the St. Louis City Jail during the time Monica Stewart mistakenly believed he was following her.  

Andre Phillips, brother of Hobo and Rekinda, best friend of the victim Mitchell, and boyfriend of Monica Stewart on November 9, 1993, testified on defendant's behalf.  Andre had a 1982 conviction for selling drugs.  He testified that Mitchell was a drug dealer and that Kimberly sometimes carried money for Mitchell for drug transactions.  According to Andre, Kimberly, Monica, and Janine Stewart were all familiar with defendant, but he admitted that all three may have only known him as "Terry."  However, according to Andre, Monica knew defendant's last name and had even visited his home.  Andre testified that Monica never questioned him about defendant after the murder of Mitchell and the shooting of Kimberly.  

Dina Thomas, defendant's aunt, testified that on November 9, 1993, defendant came by her apartment in St. Louis at approximately 7:20 or 7:30 p.m. and stayed until 9:15 p.m.  According to Thomas, defendant looked neither nervous nor suspicious that night.  

Mary Thomas, defendant's sister, testified that she saw defendant at approximately 9 p.m. on November 9, 1993, and they had a normal conversation.  She admitted on cross-examination that she did not know where defendant was prior to 9 p.m.

Patricia Thomas, defendant's mother, testified that defendant lived with her and that they had spent a typical day on November 9, 1993.  Hobo was at her house the afternoon of the shooting.  She learned of the shooting shortly after November 9, 1993, and after Hobo's arrest in December 1993 she heard of defendant's suspected involvement.  

August Manso was an East St. Louis police officer and also worked as an EMT.  In his capacity as an EMT, he arrived at the shooting scene, at which time Kimberly told him that she was shot by a person named "Hobo."  She did not mention defendant's name, but she did indicate that there were two men involved in the shooting.  Manso's report indicated that Kimberly's sister might be able to identify the second subject.

Samarian Tillman lived near Jones Park and arrived on the scene after the shooting.  She said that it was dark outside, and she and a friend came across Kimberly's car, which they believed had been in an accident.  They stopped and Kimberly told them: "Hobo did this.  My sister will know everything."  Kelsie Crain, who also lived close to Jones Park, called 9-1-1 after he heard shots and saw Kimberly's condition.  He waited with Kimberly for the ambulance to arrive.  Kimberly told him that Hobo had shot her. She only mentioned the name "Hobo".  On cross-examina­tion, Crain admitted that he told Officer Koehler that Kimberly told him that her boyfriend was dead and that her sister or best friend dated Hobo and that it was hard to understand her because she was rambling.

After hearing all the evidence, the jury convicted defendant on both charges.  He was sentenced to the Department of Corrections.  Defendant now appeals.

ANALYSIS

Defendant first contends that the trial court erred in allowing into evidence numerous hearsay statements by the State's witnesses.  Defendant specifically objects to the following statements.  First, Monica Stewart was allowed to testify that after the tubes were removed from Kimberly's mouth, Kimberly told her that "Hobo" and "Terry, Rekinda's boyfriend," shot her and Mitchell.  Second, Kimberly was allowed to testify that Mitchell spoke with the occupants of the white car while they were parked off Interstate 70 and that he then told Kimberly that Hobo and defendant were going to follow them to East St. Louis.  Defendant contends that this hearsay evidence was offered for the purpose of placing defendant in the white car with Hobo.  Third, Kimberly was allowed to testify that Mitchell told her he was going to go from Hodges' house to his mother's house and that defendant and Hobo wanted him to ride with them.  Again, defendant contends that the purpose of offering this statement was to prove that defendant was in the white car with Hobo and that they were going to meet with Mitchell again.  The State responds that these statements by the victim were all admissible under well-established exceptions to the hearsay rule.  We agree with the State.

In 
People v. Clark
, 52 Ill. 2d 374, 388-90, 288 N.E.2d 363, 371 (1972), our supreme court explained that the general rule is that even though a witness may be present in court and subject to cross-examination, he may not testify as to statements he made out of court for the purpose of corroborating his testimony given at trial relative to the same subject.  The 
Clark
 court went on to explain that there are two exceptions to this general rule, namely, to rebut a charge or inference that the witness is motivated to testify falsely or to show that the witness's in-court testimony is a recent fabrication.

In the instant case, a review of the record indicates that the inferences defendant tried to draw throughout the trial were that Kimberly's identification of defendant was a recent fabrication and that at the time of the attack Kimberly identified only "Hobo" as her attacker.  The defense attempted to show that Kimberly did not make an identification of defendant until five months after the attack.  The State rebutted this charge with Monica's testimony that Kimberly identified "Terry" as her attacker as soon as the tubes were taken out of her mouth at the hospital.  Such evidence clearly falls within the recent-fabrication exception noted above and was properly admitted.

We agree with the State that recent case law indicates that the hearsay rule does not apply to evidence of a relevant out-of-court statement when the declarant testifies and is subject to cross-examination.  In 
People v. Rogers
, 81 Ill. 2d 571, 411 N.E.2d 223 (1980), our supreme court set forth the rules governing the admissibility of the evidence in question here as follows:

"If a third person were to testify that he saw or heard A identify B as the person who committed the offense, that would obvious­ly and clearly be hearsay testimony and would not be admissi­ble.  However, if A testifies that he previously identified B and his veracity is tested by cross-examination, the reason for excluding the third person's testimony has been removed.  The third person should then be permitted to testify that he heard or saw A identify B because both A and the third person would be subject to cross-examination concerning the out-of-court identification.  Evidence of such out-of-court identifi­cation by both A and the third person should be admissible but should be used only in corroboration of in-court identifica­tions and not as substantive evidence.  Before the third person is permitted to testify as to A's identification of B, A should first testify as to his out-of-court identification."  
Rogers
, 81 Ill. 2d at 579, 411 N.E.2d at 227.

In section 115-12 of the Code of Criminal Procedure of 1963, our General Assembly has gone so far as to say that such statements may be used as substantive evidence.  725 ILCS 5/115-12 (West 1994).

In the instant case, Kimberly, under oath, identified defendant, "Terry," as her attacker.  She was subject to cross-examination.  Kimberly's sister Monica then testified as to the fact that immediately after tubes were removed from Kimberly's mouth in the hospital, her sister told her that "Terry" was her attacker.  Monica was also subject to cross-examination.  This type of testimony is permissible under 
Rogers
.  81 Ill. 2d at 578-79, 411 N.E.2d at 227; see also 
People v. Shum
, 117 Ill. 2d 317, 342, 512 N.E.2d 1183, 1190-91 (1987).

Defendant further argues that Kimberly was improper­ly allowed to testify that Mitchell told her that the two occupants of the white car, Hobo and defendant, told him that they were going to follow Mitchell and Kimberly to East St. Louis, that Mitchell told her he was going to go from Hodges' house to his mother's house, and that defendant and Hobo wanted him to ride with them.  Defendant contends that such evidence was offered only for the purpose of placing defendant in the white car with Hobo.  We disagree.

Any out-of-court statement offered to prove the truth of the matter asserted therein is hearsay and inadmissible.  
People v. Szudy
, 262 Ill. App. 3d 695, 711, 635 N.E.2d 801, 811 (1994).  However, out-of-court statements offered to prove their effect on a listener's mind or offered to show why the listener subsequently acted as he or she did are not hearsay and are admissible.  262 Ill. App. 3d at 711, 635 N.E.2d at 811.  A review of the testimony in question shows that the statements by Mitchell were not inadmissi­ble hearsay because they were not offered to prove the matter asserted but were used to explain a sequence of events and show why Mitchell and Kimberly acted as they did.  Accordingly, we find no error in the admission of this evidence.

Defendant next contends that the trial court erred in denying defendant's motion for a mistrial, on the basis that two of the jurors read or heard of a newspaper article which reported that  Kimberly was the niece of a judge and that defendant's coconspirator, Hobo, had already been convicted of the murder of Mitchell. 

The record reveals that during lunch on the second day of trial, a juror, Dina Garner, was approached by two men who were also summoned for jury duty but who were not on the instant panel.  They asked to see Garner's newspaper, which she had not yet read.  The newspaper included an article about the instant case.  One of the men said, "Here's that case, I bet you're on this one."  He also said, "That's the case where the judge's niece broke down crying on the stand the other day."  Garner replied that she did not know what they were talking about, and she threw that portion of the newspaper away without reading it.  Garner immediately reported the episode to the judge.  Upon questioning by the judge, Garner insisted that the incident would not affect her verdict.  The trial judge individually voir-dired the remaining members of the panel to find out whether anyone read the article.  One juror, Janet Keller, admitted to reading the beginning of the article but reported that once she realized the article concerned the case she was deciding, she stopped reading it.  Keller also asserted that reading that small portion of the article would not affect her ability to be fair and impartial.  The trial judge admonished Keller not to read the local section of the newspaper in the coming week.  The judge also admonished jurors Garner and Keller not to discuss what they read or the fact that they knew that one of the witnesses was a judge's niece.  Defendant's attorney noted that the article also contained information that Hobo had already been convicted of Mitchell's murder, and counsel moved for a mistrial based upon contami­nation of the jury.  Defendant's motion was denied.  

Defendant argues that because the newspaper article noted that Kimberly was the niece of a judge and that at least one juror was made aware of this, Kimberly's status and credibility would be elevated.  Second, defendant argues that the fact the jury members were privy to the information that Hobo had already been tried and convicted of the instant crimes was prejudicial to him.  Third, defendant argues that the judge never inquired into what other information was contained in the article, which means there could have been even more prejudicial information contained in the article.  Defendant insists that the admonishments were inadequate and that he was denied a fair trial.  We are unconvinced by defendant's arguments.  

The standard to be applied in determining whether to reverse based upon a tainted jury is whether it reasonably appears that at least some of the jurors have been influenced or prejudiced so that they cannot be fair and impartial.  
People v. Malmenato
, 14 Ill. 2d 52, 150 N.E.2d 806 (1958).  The burden falls on the party challenging the juror to show that he has a disqualifying state of mind; mere suspicion of partiality is not enough.  
People v. Jarnagan
, 154 Ill. App. 3d 187, 197, 506 N.E.2d 715, 722 (1987).  The decision whether to grant a mistrial based upon the fact that jurors read a newspaper article concerning the trial at hand is left to the sound discretion of the trial court.  
People v. Watson
, 263 Ill. App. 3d 551, 557, 635 N.E.2d 795, 799 (1994).  

After reviewing the record in the instant case, we cannot say that the trial court abused its discretion in refusing to grant a mistrial.  Juror Garner was conscientious enough to report the incident in which it was disclosed to her that one of the witnesses was the niece of a judge.  This indicates to us that she most likely would have told the judge she could no longer be fair and impartial if that were the case.  Likewise, Juror Keller was straightforward and admitted to reading the first part of an article concerning the instant case.  Defendant argues that we are not aware of what other prejudicial information might have been contained in the article, but the burden fell on him to show that these jurors were no longer fair and impartial.  Defendant should have included a copy of that article for the record.  The record before us does not support defendant's allegations.  Finally, we agree with the State that even if some of the jurors possessed knowledge of Hobo's conviction, this alone does not prejudice defendant; it supports defendant's theory at trial that Hobo was guilty and defendant was not.  Accordingly, we cannot say that the trial court abused its discretion in failing to grant a mistrial.

Defendant next asserts that the trial court erred in denying his motion for a new trial, based upon the fact that one of the jurors failed to disclose that she knew defendant's mother, an announced witness at trial.  Defendant claims that the juror, Mary Gilliam, inadvertently gave false information by not disclos­ing during 
voir dire
 that she knew defendant's mother.  Defendant further claims that Gilliam bears animosity toward his mother and that therefore he was prejudiced by her presence on the jury.  We disagree.  

A juror's failure to reveal potentially prejudicial information during 
voir dire
 or even a juror's false testimony during 
voir dire
 does not automatically entitle the defendant to a new trial.  Defendant must show that prejudice resulted.  
Pekelder v. Edgewater Automo­tive Co
., 68 Ill. 2d 136, 139, 368 N.E.2d 900, 901 (1977).  Where a defendant does not learn of facts which might support a finding of partiality by a juror until after a verdict is reached, a posttrial evidentiary hearing may be in order.  
People v. Witte
, 115 Ill. App. 3d 20, 30, 449 N.E.2d 966, 973 (1983).  The determi­nation of whether to grant a new trial on this basis is within the sound discretion of the trial court and will not be disturbed on appeal unless a clear abuse of discretion is shown.  
Pekelder
, 68 Ill. 2d at 139, 368 N.E.2d at 901; 
People v. Hunt
, 112 Ill. App. 3d 138, 141, 445 N.E.2d 408, 411 (1983).

In the instant case, the trial court correctly held an evidentiary hearing after defendant raised the issue of Gilliam's partiality.  Both Gilliam and defendant's mother testified.  The gist of their relationship was that they both worked at the same place of business, but on separate shifts.  According to Gilliam, she was not even aware that she knew defendant's mother until sometime after she testified.  The mother herself testified that she knew Gilliam but only said "Hello" and "Goodbye" to her occasionally.  While defendant's mother alleged a general hostility in the work environment, it was clear from her testimony that this was not due to Gilliam specifically, but rather to the overall atmosphere on the job.  The trial court found that defendant did not meet his burden of proof and, thus, was not entitled to a new trial.  After reviewing the record, we cannot say that the trial court abused its discretion, and we will not order a new trial on these grounds.

The final contention raised by defendant is that the trial court erred in denying defendant's motion to dismiss, because the delay of one year between defendant's indictment and arraignment violated defendant's sixth amendment right to a speedy trial (U.S. Const., amend. VI).  The State replies that defendant's arraignment was delayed for one year because he was in the custody of another state awaiting trial on an unrelated murder charge and that therefore the delay was justifiable and not a violation of defendant's right to a speedy trial.  We agree with the State.  

In order to determine whether a breach of the constitutional right to a speedy trial has occurred, four factors are to be considered:  (1) the length of the delay, (2) the reasons for the delay, (3) the prejudice to defendant, and (4) whether defendant waived the right.  
People v. Jones
, 104 Ill. 2d 268, 286, 472 N.E.2d 455, 463 (1984); see also 
Barker v. Wingo
, 407 U.S. 514, 33 L. Ed. 2d 101, 92 S. Ct. 2182 (1972).  

Defendant was indicted on May 27, 1994, at which time he was in a Missouri jail awaiting trial on an unrelated murder charge.  Defendant was found guilty of manslaughter and armed criminal action in Missouri on March 16, 1995, and was sentenced on those charges on April 21, 1995.  Defendant was transferred to Illinois on June 6, 1995, and was arraigned on the instant charges on June 8, 1995.  The record does not indicate that defendant ever demanded extradition to Illinois on the instant charges.  Further­more, Agent Koehler testified at a hearing on defendant's motion to dismiss that Missouri authorities would not allow defendant out of their custody until he was tried on the charges pending in Missouri.  This evidence was unrebutted by defendant.  We believe that the reason for the delay was justifiable.

Additionally, defendant fails to set forth any evidence that his defense was hindered by the delay.  The record reflects no prejudice.  At the hearing on defendant's motion to dismiss, defense counsel argued that the articulable prejudice to defendant was that the first two witnesses on the scene, Samarian Tillman and Kelsie Crain, who could offer exculpatory testimony, would not be available.  However, both these witnesses testified for defendant at trial.  Additionally, defendant was able to offer the alibi testimony of family members.  Given these facts, we find that defendant's constitutional right to a speedy trial was not violated.

For the foregoing reasons, the judgment of the circuit court of St. Clair County is affirmed.

Affirmed.

CHAPMAN and MAAG, JJ., concur.