LOUISE BRAWNER, as Independent Adm'r of the Estate of Emmett Blanton, Jr., Deceased, Plaintiff-Appellant, v. THE CITY OF CHICAGO *et al.*, Defendants-Appellees.

First District (1st Division)   No. 1—00—3594

Opinion filed March 17, 2003.

Patrick M. Brooks, of Chicago, for appellant.

Mara S. Georges, Corporation Counsel, of Chicago, for appellees.

JUSTICE SMITH delivered the opinion of the court:

Following the entry of judgment by the circuit court on a jury verdict in favor of defendants City of Chicago (City) and Chicago police officer Timothy Covelli in this wrongful death and survival action, plaintiff Louise Brawner, as the independent administrator of the estate of Emmett Blanton, Jr. (Blanton), appeals. On appeal, plaintiff contends the court erred by allowing testimony concerning alleged hearsay statements and defense counsel violated *in limine* rulings concerning the use of such statements. Plaintiff contends defense counsel also improperly attempted to elicit undisclosed opinion testimony. Plaintiff further contends the court improperly admitted evidence of the decedent's, Blanton's, cocaine intoxication at the time of his death and allowed defendants' toxicology expert to testify about Blanton's mental state during the incident. For the reasons that follow, we affirm.

## Background

This action originated in September 1996, when Emmett Blanton, Sr., as special administrator of Blanton's estate, filed a complaint against the City alleging that Chicago police officers wilfully and wantonly shot and killed Blanton without probable cause on August 23, 1996. The incident in question began with Blanton's alleged unlawful restraint of a woman in his car, then involved a police pursuit of Blanton, during which Blanton drove recklessly, struck a building and several vehicles, endangered police officers and ultimately threatened officers who then shot him. Brawner, as the independent administrator of Blanton's estate, subsequently replaced Blanton, Sr., as plaintiff. A third amended complaint was filed in March 2000, in which plaintiff sought to recover damages under wrongful death and survival claims (740 ILCS 180/1 (West 1996); 755 ILCS 5/27—6 (West 1996)), and alleged that defendants and Chicago police officer Jeffrey Jablon wilfully and wantonly shot and killed Blanton.

In their answer, defendants denied plaintiff's material allegations and asserted affirmative defenses of, among other things, governmental

immunity (745 ILCS 10/2—202 (West 1996)), justifiable use of force (720 ILCS 5/7—1, 7—5 (West 1996)), and Blanton's own negligent, wilful and wanton, and intentional conduct. Defendants alleged that Blanton's own conduct, which consisted of committing several criminal offenses, attempting to flee the police, and acting under the influence of cocaine, was the cause of any injuries or damages that resulted.

## Motions *in limine*

In March 2000, the court heard the parties' motions *in limine*. Among other things, plaintiff apparently sought to bar reference to evidence of Blanton's "drug use," including the presence of cocaine in Blanton's system at the time of the incident. Defense counsel discussed the expected testimony of a pharmacology expert (O'Donnell) concerning the effects of cocaine on Blanton based on the autopsy toxicology report. The court found that cocaine was "definitely an issue in this case" and, noting that there was evidence of Blanton's use of drugs, denied plaintiff's motion.

Then the parties discussed at length plaintiff's motion concerning Blanton's "mental condition and state of mind," apparently seeking to bar O'Donnell's conclusions about Blanton's cocaine intoxication and paranoia. Over plaintiff's objection that O'Donnell was not qualified to render a psychiatric diagnosis regarding paranoia, the court allowed the defense to present O'Donnell's testimony as to the "manifestations" of cocaine intoxication. The court ruled that Blanton's drug use was relevant and, over plaintiff's objection that the police officers had no knowledge of the drug use, denied plaintiff's motion. Following the hearing, the court entered a written order in which, among other things, it denied plaintiff's "motions *in limine* regarding [Blanton's] mental condition and state of mind, [Blanton's] drug use and motion with respect to drug paraphernalia found at the scene."

Before trial in April 2000, the court heard additional motions *in limine*. At that hearing, argument centered on plaintiff's motion "to bar evidence and testimony regarding statements made by or attributed to Shadell Taylor," the alleged victim of unlawful restraint by Blanton. According to the parties, Taylor told police officers essentially that Blanton held her in his car against her will, threatened her by holding a screwdriver to her neck, and pushed her from his car. Defense counsel argued that the incident with Taylor was part of the "database" that both parties' experts, including plaintiff's police procedure expert (Johnson) and O'Donnell, had relied upon to form their opinions. Plaintiff's counsel conceded that the fact that Blanton was originally wanted for unlawful restraint was relevant, but objected to Taylor's statements about Blanton's use of the screwdriver to

threaten her as hearsay. The court ruled that the "unlawful restraint will come in" and the witnesses could rely on Taylor's statements. In further discussion, the court clarified that the defense would not call Taylor as a witness because she could not be found. Defense counsel argued that plaintiff's expert Johnson relied on the alleged hearsay in his deposition and, because Blanton's use of the screwdriver was "specifically" mentioned in Johnson's notes, it was relevant as a basis for Johnson's opinions. The court ultimately denied plaintiff's motion concerning Taylor's statements.

The court then considered plaintiff's motion "to bar evidence and testimony regarding contents of notes found in decedent's vehicle." Defense counsel argued that O'Donnell relied on the notes in part, and the court ruled that, even if such material itself was not admissible, it could be relied upon by the witnesses. The court allowed the experts' conclusions based on the notes, specifying that O'Donnell could say Blanton was "depressed *** from reviewing these notes," but granted plaintiff's motion as to the notes themselves. Following the hearing, the court entered a written order in which, among other things, it denied plaintiff's motion "to bar evidence and testimony regarding statements made by or attributed to Shadell Taylor."

## Trial: Plaintiff's Case

The following day the trial began and, in opening statement, defense counsel referred to the incident involving Shadell Taylor in Blanton's car. Plaintiff objected, and in a sidebar conference, the court ruled that Taylor's statements were admissible to show the officers' "mindset as they start off on this chase [of Blanton]," but not for the truth of the matter asserted. After the court further ruled that the statements should be prefaced with the phrase "told that" to the officers, plaintiff entered a continuing objection to such statements.

Plaintiff called several Chicago police officers to testify as adverse witnesses pursuant to section 2—1102 of the Code of Civil Procedure. 735 ILCS 5/2—1102 (West 2000). Officer Timothy Covelli testified that on August 23, 1996, he and his partner, Robert Balesh, first received an emergency flash message about a crime in progress when they were at the police station shortly after midnight. According to the message, Blanton tried to ram a police car head-on after crossing into the oncoming lanes in traffic. The officers were in their squadrol, with Officer Balesh driving, when they received a second message concerning Blanton around 12:25 a.m. That message conveyed that the police were chasing Blanton because there was a kidnapping involved. According to the message, Shadell Taylor told the police that Blanton "grabbed her off the street," tried to ram a police car, and, when the

police car made chase, he shoved her out of the car. In response to the message, the officers went toward Halsted and Clark Streets with their sirens and emergency lights activated. There, they saw Blanton's car and a few squad cars in pursuit, and they joined in the chase. On direct examination, Officer Covelli testified that, at that point, based on the emergency message, he believed Blanton was armed and dangerous. Plaintiff objected to testimony as to what Officer Covelli believed, and the court sustained the objection and struck the response.

Officer Covelli further testified that he and Officer Balesh pursued Blanton to the intersection of Clark Street, Diversey Parkway, and Broadway Street, where they saw Blanton's car crash into a store window on one corner, then back up. There were squad cars around Blanton and about six police officers on foot, with their guns drawn. Blanton's car came "flying back" off the curb by the store and, in an attempt to flee, Blanton "chased" a few officers out of the intersection, almost hitting them. Blanton chased one officer "way out of the way, like [he was] trying to run him down" and he smashed into other officers' squad cars. All the officers were yelling at Blanton, directing him to stop and show his hands, but Blanton failed to comply. Instead, Blanton began to drive forward and Officer Covelli heard one gunshot fired from the direction of Blanton's car. At the time, Officer Covelli did not know who fired the shot. Blanton's car then jumped the curb onto the sidewalk on Diversey Parkway, and Blanton drove eastbound at about 40 miles per hour on the sidewalk, causing police officers and pedestrians to run for cover and dive out of the way. Blanton returned his car to the street and continued driving east on Diversey Parkway, then turned south onto Pine Grove Avenue and struck a parked car at the "T-shaped" intersection at Wrightwood Avenue. The officers pulled up about eight feet behind Blanton's car, blocking Blanton from going north on Pine Grove Avenue, but without "wedg[ing]" him in the space, and activated a high-intensity light to shine into the rear of Blanton's car.

As soon as they stopped, Officer Covelli got out of the squadrol and, standing behind the open passenger door, he drew his gun and pointed it through the open passenger door window for cover. Officer Covelli had his gun out because he was afraid for his life. He considered Blanton to be "a very dangerous man" based on all of Blanton's conduct up to that point, including everything he had seen, the emergency messages he received, and the fact that Blanton was "behaving like a crazy person." Once Officer Covelli assumed the position of cover, he saw Blanton back up his car and ram into the front of the squadrol, hitting the bumper. From the time the squadrol had

stopped, Officers Covelli and Balesh shouted warnings and instructions to Blanton, directing him to get out of his car. Other police units approached behind them, but Officer Covelli did not see them because his attention was focused on Blanton. Blanton did not attempt to go in either direction on Wrightwood Avenue. After backing into the squadrol, Blanton's car "bounced off" the squadrol and came to a stop.

According to further testimony, the next thing Officer Covelli saw was Blanton in his car, going down to his right and appearing to reach to the floor for something, disappearing completely from view. Then, in a single motion, Blanton "popped" up and turned toward Officer Covelli, swinging his right arm over the middle of the front seat of his car and holding a shiny object in his hand that he pointed at the officer. At that moment, Officer Covelli was "scared to death" and he fired his gun at Blanton because he believed that Blanton was pointing a gun at him and was going to shoot him. Officer Covelli fired six times, continuing to shoot until he thought the threat was over. Then, with other officers, Officer Covelli approached Blanton's car, but he stopped at the rear bumper because he was still "in shock" and scared.

Officer Covelli did not make an official statement at the scene, but he told a sergeant there that he had fired his gun and turned in the gun. Officer Covelli returned to the police station, where he made reports and spoke with police personnel. When he learned that no gun was found in Blanton's car, Officer Covelli still thought there was a gun that had not yet been found. Officer Covelli filled out a weapon discharge report and a statement to his commanding officer within hours of the incident; those reports were accurate, but were only summaries. About two or three months later, Officer Covelli made an official written statement in which he mentioned the shiny object that Blanton held.

Officer Jeffrey Jablon testified that, at the time in question, he was on duty alone in an unmarked vehicle when he received a radio message about Blanton and the police pursuit. After receiving a second emergency message, Officer Jablon activated his emergency equipment and joined in the chase. Officer Jablon testified substantially consistent with Officer Covelli as to the incident at the store at Clark Street and Diversey Parkway. The officer heard a shot when Blanton pulled away from the store and did not know who had fired, but thought there was a "50/50 chance" that the shot came from Blanton. Officer Jablon saw Blanton nearly hit one police officer with his car and another officer jump backwards onto the hood of his squad car to avoid getting hit.

Officer Jablon further testified that he saw Blanton drive on the

sidewalk on Diversey Parkway, continued to follow him, and pulled up to the scene on Pine Grove Avenue after Officer Covelli's squadrol had stopped. Officer Jablon drew his gun when he got out of his car because, based on everything known about Blanton to that point, he was dealing with a dangerous, and possibly armed, man. As Officer Jablon approached Blanton's car, he saw Blanton, who had turned around in the car to face Officer Covelli, point with something that he held in his right hand. Officer Jablon was in fear for his life and prepared to fire his gun. He heard Officers Covelli and Balesh shout at Blanton before he heard shots. When he heard the gunshots, Officer Jablon thought he was being shot at, and, upon seeing and hearing the glass in Blanton's car windows break, he started to fire his gun. Officer Jablon discharged 10 bullets in rapid succession and later informed a sergeant at the scene that he had fired his gun. When he returned to the police station, Officer Jablon filled out reports but he did not remember if he mentioned in the reports that Blanton had something in his hand.

Officer Robert Balesh testified to substantially the same account of the incident as Officer Covelli. Officer Covelli had already gotten out of the squadrol at Pine Grove and Wrightwood Avenues, while Officer Balesh was still inside, with his door open. Officer Balesh was yelling instructions at Blanton and getting out of the squadrol when the shots were fired. Blanton looked to both sides, as if looking for "an avenue to escape," then backed up his car and struck the squadrol. After Blanton's car bounced off the squadrol and rolled forward, Blanton bent down to his right and came up with his arm "flinging out" toward Officer Balesh. When Blanton's arm "came back," Officer Balesh saw something shiny in Blanton's hand. Officer Balesh thought Blanton had a gun, and he "flinched down" and slid out of the squadrol, fearing for his life because he was not in a good position. Blanton's arm was swung over in a "threatening manner" toward Officer Covelli. After the shots were fired, Officer Balesh approached Blanton's car with other officers and he saw that Blanton was still breathing, performed a quick pat-down search of Blanton and looked for a weapon. Officer Balesh completed a report to his commander later that day and did not mention any shiny object in the report. Balesh was shocked when he learned there was no gun in Blanton's car.

The final Chicago police officer to be called as an adverse witness, Joseph Moran, testified that, on the day in question, he worked as a forensic investigator at the crime scenes at Clark Street and Diversey Parkway, and at Pine Grove and Wrightwood Avenues. Officer Moran did not remember talking to Officers Covelli or Jablon at the scene.

Officer Moran saw damage to the headrest of the driver's seat in Blanton's car, but he did not know if it was a bullet hole. There was a hole in the dashboard that Officer Moran believed to be from a bullet, red spatters that could have been blood on the steering wheel, and bullet holes in the rear trunk area. Officer Moran found one screwdriver on the floor of Blanton's car behind the passenger seat and another screwdriver on the rear passenger seat. Detectives at the scene had already inventoried the screwdrivers.

The first of two occurrence witnesses to testify was Selvin Jones, who worked in maintenance in a building on Lakeview Avenue, near the intersection of Pine Grove and Wrightwood Avenues. At the time in question, Jones was fixing a light fixture on an upper canopy. Jones was working on a 40-foot ladder when he heard the "squeaking" of tires from two cars, a bang, and police sirens, followed by about 10 gunshots. After Jones descended the ladder and hid behind a pillar, he heard several more shots.

Steven Baron, who was the night doorman in the building where Jones worked, testified that he became aware of the police chase of Blanton by listening to a police scanner. According to a scanner report, a victim had fallen or was pushed from Blanton's car and Blanton struck a building. When the vehicles entered the intersection, Baron was positioned by the window. There were pillars obstructing the view, but Baron saw Blanton's car and the squadrol stop in the intersection, and he heard sirens, followed by a shot. Baron then went behind his desk and heard 15 more shots, but he could not tell what direction the shots came from.

Louise Brawner, Blanton's mother, testified that Blanton had been married twice and had a daughter, Emily, with his second wife, Robin. One of the reasons for Blanton's divorce from Robin was his drug use. Brawner knew that Blanton had been in a drug rehabilitation program in 1996, but she was not aware that he had been in such programs twice before.

Robin Yvette Blanton testified that she married Blanton in October 1991. In 1992, she gave birth to Emily and became aware that Blanton had a drug problem. Blanton told Robin he had been using cocaine and he entered a drug rehabilitation program that year. When Emily was two years old, Blanton relapsed and was admitted to another rehabilitation program. Robin filed for divorce in 1994 due to Blanton's drug problem. Blanton told her that he entered another drug treatment program in 1996.

Dr. Eupil Choi, a forensic pathologist, testified that he performed the autopsy on Blanton. There were gunshot entry wounds to the back of the neck and the upper back, and on the back side of the right up-

per arm. The toxicology report showed that Blanton tested positive for cocaine and a metabolite of cocaine, which indicated the presence of cocaine in Blanton's system for a longer period of time.

Dr. Robert Kirschner, a forensic pathologist with a specialty in anatomic pathology, testified that, based on his review of materials, he believed Blanton was facing away from the shooter. Dr. Kirschner opined that one of the two "lodged" wounds to the back, which were caused by bullets that were recovered and traced to Officer Covelli's gun, was potentially fatal. Dr. Kirschner agreed with Dr. Choi's interpretation of the wound to the right upper arm, that the entry was from the back and the exit was in the front. He did not believe that the entry wound in the arm was consistent with Blanton being turned around in his car and pointing back with his right arm, but he concluded that it was not possible to determine the position of Blanton's arm at the time of the injury. Dr. Kirschner admitted that the moment when Officer Covelli saw Blanton's threatening motion and the moment when the shot struck Blanton were different. He further admitted that finding cocaine in Blanton's system might explain Blanton's actions before the shooting.

Gregory Johnson, a licensed private detective and former Chicago police officer and Cook County State's Attorney's Office investigator with experience investigating excessive-force complaints against police officers, testified that he reviewed various police reports and listened to police emergency radio tapes in this case. Johnson concluded that the police officers were not justified in their use of force, basing his opinion, in part, on the fact that the reports filed by the officers on the day of the incident did not mention the shiny object that they saw in Blanton's hand, but later reports included such mention. Johnson also reviewed the autopsy report and, on cross-examination, stated that it contained toxicology results showing the presence of cocaine in Blanton's system.

Johnson stated that the cocaine was significant because it would explain Blanton's erratic behavior and he admitted that a crack pipe had been recovered from Blanton's pocket. Johnson opined that Blanton's holding Taylor against her will and shoving a screwdriver to her neck constituted erratic behavior that should be considered dangerous by the police. He admitted that Blanton committed a violent act by trying to ram an officer's car and further opined that a police officer hearing the emergency message about Blanton should proceed as if Blanton were armed and dangerous. Johnson further admitted that Blanton jeopardized the lives of innocent people when he fled, he caused property damage and endangered police officers, and was "extremely dangerous." Johnson admitted that Blanton acted ir-

rationally, erratically, and showed "every intention of trying to escape," and the police reports mentioned that the officers believed Blanton had a gun.

During the cross-examination of Johnson, after defense counsel asked a question regarding Taylor's statement about Blanton threatening her with a screwdriver, the court called for a sidebar conference. At that time, the court noted plaintiff's standing objection and clarified that the statement was relevant to show the state of mind of the officers but was not admissible to prove the truth of the matter asserted.

Plaintiff then rested and the defense moved for a directed verdict in favor of Officers Jablon and Covelli. The court granted the motion as to Officer Jablon but denied it as to Officer Covelli.

### Defense Case

Chicago police officer Paul Venticinque testified that he and his partner were driving north on Broadway Street in an unmarked squad car, when Blanton's car, which was southbound, came into the northbound lane toward them. Officer Venticinque, who was driving, had to swerve to avoid being hit head-on. He immediately made a U-turn and activated the emergency equipment. At that time, Officer Venticinque saw Blanton's car stop abruptly, the passenger door open and Shadell Taylor "fly out backwards onto to [sic] street." Blanton's car then sped away and Taylor ran toward the officers, screaming "hysterically" and waving her hands, and she jumped in the backseat of the police car.

Plaintiff objected to testimony about the content of Taylor's conversation with the officers on the basis of hearsay. In a sidebar conference, defense counsel argued that Taylor's statements were offered to show Officer Venticinque's state of mind and his response, and they also qualified as excited utterance hearsay exceptions. In overruling plaintiff's objection, the court stated that the objection had been covered in the motion *in limine* and the statements were not being offered for the truth of the matter asserted.

Officer Venticinque testified that Blanton continued speeding south on Broadway Street, through a red light. Taylor told the officers that Blanton "wouldn't let her go" when she tried to get out of his car, but instead, he "pushed" a sharp, shiny object under her throat, told her she was going to "complete the drama," and pushed her toward the door. Taylor said she thought she was going to be killed and eventually told the officers that the sharp object Blanton held to her throat was a screwdriver. She was physically shaken and screaming, and, because they were chasing Blanton's car, it was hard for the

officers to get all the necessary information from her. Officer Venticinque's partner called in the incident as an unlawful restraint. While they were pursuing Blanton, the officers were trying to determine, from Taylor's account, if the incident was a kidnapping or unlawful restraint. At the time, the officers did not know if Blanton had a gun.

Officer Venticinque further testified that he lost sight of Blanton's car, but ultimately arrived at the scene at Pine Grove and Wrightwood Avenues. There, Taylor identified Blanton's car as the one she had been held in. Officer Venticinque turned off the ignition in Blanton's car, saw that Blanton, who had been removed from the car, was severely injured, and told his partner to call an ambulance. Taylor saw Blanton and identified him as the person who prevented her from getting out of the car. Officers Covelli and Jablon told Officer Venticinque, in response to his questions, that they fired shots. The paramedics informed him that Blanton was deceased.

Chicago police officer Norman Knutson testified that he and his partner became involved in the chase when they saw Blanton drive through a red light. They saw Blanton crash into the store and pulled up next to him. Officer Knutson got out of the car with his weapon drawn and ordered Blanton to shut off the ignition. Blanton, who was facing away, turned toward Officer Knutson and "growled," then "threw" his car into reverse. When Blanton's car broke loose from the store, it struck Officer Knutson's squad car and another officer's car. Blanton then drove directly toward Officer Knutson, who escaped injury by jumping onto the hood of the squad car. Blanton drove into the store again, and again reversed his car, hitting the squad car and removing the bumper. Blanton backed up and headed toward the sidewalk where two other officers were standing, so Officer Knutson fired a shot into the front passenger-side tire of Blanton's car. The two officers jumped out of the way and Blanton drove down the sidewalk. At the scene on Wrightwood, Officer Knutson informed a sergeant that he had fired his gun and turned in the gun.

Chicago police detective Robert Soreghan testified that he processed the scene at Pine Grove and Wrightwood Avenues for evidence collection. He searched Blanton's car, and recovered and inventoried two screwdrivers, among other items. Detective Soreghan also recovered a crack pipe from Blanton's person. He directed another officer to photograph the interior of Blanton's car where the screwdrivers were recovered based upon a determination that a screwdriver might have been the object the officers saw in Blanton's hand. The screwdriver that was found on the backseat of Blanton's car was inventoried as a weapon, based on the position, and screwdriver found

on the rear floor was inventoried as evidence. Detective Soreghan later interviewed Officers Covelli and Jablon, who were kept separate so that their statements could be made independently.

James O'Donnell, an expert pharmacologist and pharmacist, testified to a reasonable degree of scientific certainty that, based on a review of materials, including toxicology results in Blanton's autopsy report and descriptions of Blanton's behavior before the shooting, Blanton was intoxicated and impaired by cocaine at the time of his death. The toxicology tests showed both recent use of cocaine by Blanton, sufficient to cause intoxication, and prolonged use throughout the day. O'Donnell described certain behavioral manifestations consistent with cocaine intoxication.

Plaintiff objected when O'Donnell mentioned "signs of paranoia" as such manifestation of cocaine intoxication. In a sidebar conference, plaintiff argued that O'Donnell was not qualified to render an opinion as to "psychological, psychiatric conditions of paranoia." Defense counsel argued that O'Donnell was not offering a psychiatric "diagnostic" of Blanton and the court overruled the objection. O'Donnell further testified that diminution in judgment and control, psychotic and reckless behavior, aggressiveness, and increased risk-taking and tendency to violence were among the toxic manifestations of cocaine. In this case, the behavioral changes were corroborated by Blanton's extreme reckless driving, risk-taking, fleeing the police, running red lights, speeding, and, as described by witnesses, "talking crazy" and "acting like a madman."

John Bowman, a professor in police firearms training specializing in the use of deadly force, testified that based on a review of various materials, he believed to a reasonable degree of professional certainty that Officer Covelli acted reasonably and "actually had no choice to point the weapon [and] use deadly force."

Dr. Martin Fackler, a physician and specialist on wound ballistics, testified that, after reviewing various materials, he believed to a reasonable degree of medical certainty that the evidence indicated that "the incident [was] very consistent with exactly what the officers said happened." Dr. Fackler described the wound in Blanton's arm as a "front-to-back" wound and believed that the back wounds indicated torso movement that was "a continuation" of the movement made by Blanton when he had his arm over the seat. Dr. Fackler believed, based on the difference in angles of the bullets, that Blanton was turning in a counter-clockwise direction when the shots were fired. He also believed that Blanton was hit in the arm, he reacted defensively by turning away and was hit by the other bullets while turning. Dr. Fackler explained that there was a reaction response time and, from

the time the officers saw Blanton's arm in a particular position until the time the bullets struck, the position of Blanton's arm could change.

Dr. Vincent DiMaio, a leading authority on gunshot wound analysis, testified that he believed to a reasonable degree of medical certainty that the injuries to Blanton were incurred in a manner consistent with the police officers' accounts of the incident. Dr. DiMaio disagreed with Dr. Choi's conclusion about the entrance and the exit wounds in Blanton's arm, believing instead that the physical evidence matched the officers' account of the incident.

The jury returned a verdict in favor of the City and Officer Covelli and the court entered judgment on the verdict. Plaintiff subsequently filed a motion for a new trial, arguing, among other things, that Taylor's statements were improperly admitted as hearsay exceptions and improperly used by defense counsel to suggest to the jury that the statements were substantive evidence, defense counsel violated rulings concerning undisclosed opinions, and the court improperly admitted evidence of Blanton's cocaine intoxication and O'Donnell's testimony concerning Blanton's behavior. The court denied the motion, finding, among other things, Taylor's statements were admissible to show the effect on the officers who heard the statements and as excited utterances; plaintiff's objections to defense counsel's use of Taylor's statements and undisclosed opinions were sustained; and evidence of Blanton's cocaine use and O'Donnell's testimony were properly admitted.

## Discussion

Plaintiff raises essentially the same contentions on appeal. The appeal centers around the admission of alleged hearsay statements made by Shadell Taylor to Officer Venticinque and his partner after she was pushed from Blanton's car. Despite acknowledging the relevance of the statements to show Officer Venticinque's state of mind, plaintiff contends the trial court erred by allowing Officer Venticinque to testify as to what Taylor told him because Taylor's statements were unreliable. Plaintiff further contends the statements were irrelevant to Officer Covelli's state of mind and prejudicial.

■ Out-of-court statements that are offered to prove the truth of the matter asserted therein are hearsay and inadmissible. *Hallowell v. University of Chicago Hospital*, 334 Ill. App. 3d 206, 211, 777 N.E.2d 435 (2002). However, when such out-of-court statements are offered to prove their effect on a listener's mind or to show why the listener subsequently acted as he did, they are not hearsay and are admissible. *People v. Thomas*, 296 Ill. App. 3d 489, 499, 694 N.E.2d 1068 (1998).

■ Initially, we note defendants' contention that Officer Covelli's conduct was justifiable under the Criminal Code of 1961 as a proper

use of force because Blanton was a dangerous fleeing felon. 720 ILCS 5/7—5(a)(2) (West 1996). Defendants further contend that the shooting, as allowed by law, did not constitute tortious conduct, and, therefore, Officer Covelli was entitled to a directed verdict at the close of plaintiff's case. However, we believe the case was properly submitted to the jury. See *Simmons v. City of Chicago*, 118 Ill. App. 3d 676, 682, 455 N.E.2d 232 (1983).

■ In the instant case, the statements made by Shadell Taylor to the police were offered in Officer Venticinque's testimony to show why the police pursuit of Blanton began or the effect of those statements on the listener. Officer Venticinque's testimony established how the entire incident with Blanton started. The officer described his observations of the events that occurred in rapid succession after Blanton's car almost rammed his squad car head-on. Officer Venticinque's account of what happened, including what he saw and heard from Taylor, explained why he and the other officers chased Blanton. As such, the information the officer learned from Taylor was not offered to prove that Blanton actually tried to kill Taylor or threatened her with a screwdriver. Rather, such statements were properly admitted to explain the circumstances surrounding the police pursuit. See *Thomas*, 296 Ill. App. 3d at 499.

While essentially admitting the relevance of Taylor's statements to show the effect on the listener and explain the pursuit of Blanton, plaintiff asserts that the statements were unreliable. Plaintiff bases the challenge to the reliability of Taylor's statements on the fact that Taylor gave the police an address at which she later could not be located. Plaintiff relies primarily on the testimony of police procedure expert Johnson. However, Johnson did not characterize Taylor's statements as unreliable, but, rather, he explained that, without locating Taylor, he could not determine Taylor's trustworthiness. The record establishes that Taylor's statements were corroborated in that Officer Venticinque saw Taylor thrown from Blanton's car and two screwdrivers were found in Blanton's car. To that extent, the record therefore contradicts plaintiff's claim that the statements were unreliable.

Additionally, plaintiff contends Taylor's statements were irrelevant to show Officer Covelli's state of mind. As support for this contention, plaintiff relies upon *Medina v. City of Chicago*, 238 Ill. App. 3d 385, 397-98, 606 N.E.2d 490 (1992), in which the court held that the evidence that the victim was unarmed was properly excluded. In *Medina*, the court discussed the trial court's reliance on *Sherrod v. Berry*, 856 F.2d 802 (7th Cir. 1988), acknowledged that a Seventh Circuit decision is not controlling, but agreed with *Sherrod* that the reasonableness of a police officer's actions in shooting a suspect should

be determined based on the totality of circumstances known to the officer at time of the incident. To that extent, *Medina* supports defendants.

Defendants here did not represent that Officer Covelli had direct knowledge of the entirety of Taylor's statements. Rather, the effect of Taylor's statements was made directly on Officer Venticinque, who, in turn, caused the emergency message concerning unlawful restraint to be broadcast. In that manner, Officer Covelli became personally aware that Blanton was wanted for unlawful restraint. Thus, Taylor's statements were relevant because they formed the basis for the transmission about unlawful restraint, which was information possessed by Officer Covelli at the time of the incident. See *Sherrod*, 856 F.2d at 805 (reasonableness of police officer's actions must be based on information known to officer at time of shooting); see also *Palmquist v. Selvik*, 111 F.3d 1332, 1339-41 (7th Cir. 1997) (evidence properly limited to the police officers' personal knowledge, experiences and observations, including evidence of decedent's actions and reasonable inferences that intoxicants affected his conduct). Therefore, because the statements provided information for the emergency message, the contents of which, in turn, became personal knowledge possessed by Officer Covelli, and also because they were excited utterances (*People v. Fields*, 71 Ill. App. 3d 888, 892, 390 N.E.2d 369 (1979); see also *People v. Lang*, 106 Ill. App. 3d 808, 810, 436 N.E.2d 260 (1982)), we find Taylor's statements were properly admitted.

■ Plaintiff next contends that defense counsel committed reversible error by repeatedly violating the court's *in limine* ruling concerning the use of Taylor's statements. Plaintiff contends defense counsel first violated the ruling in opening statement by referring to information supplied to Officer Venticinque by Taylor. Contrary to plaintiff's assertion, there was no violation of a ruling in that instance. The record establishes that the court ruled *in limine* that the unlawful restraint was admissible and the witnesses could rely on Taylor's statements. During a sidebar conference, the court, in allowing Taylor's statements to show the effect on the officers, ruled that the statements be presented as "told to" the officers, and defense counsel complied.

Plaintiff further contends that defense counsel again violated the court's ruling concerning Taylor's statements in cross-examination of Johnson and during closing argument. However, in both instances, defense counsel prefaced the reference to Taylor's statements as instructed by the court. In the first instance, during a sidebar conference to address plaintiff's objection, the court reiterated that Taylor's statements were not to be used for the truth of the matter asserted.

During closing argument, the court sustained plaintiff's objection. Despite that ruling in the latter instance, plaintiff distorts the record by suggesting that defendants were the "losing party" in matters relating to the use of Taylor's statements. In fact, defendants prevailed on the motion *in limine* when the court denied plaintiff's motion to bar Taylor's statements. *Cf. Kutchins v. Berg*, 264 Ill. App. 3d 926, 929, 638 N.E.2d 673 (1994) (plaintiff repeatedly violated order granting defendants' motion *in limine*). Therefore, in these two instances, we find no repeated disregard for the court's rulings as to constitute reversible error.

■ Plaintiff also contends that defense counsel committed reversible error by twice "attempting to violate" an alleged order *in limine* with respect to undisclosed opinion testimony. Plaintiff contends that, first, during direct examination Officer Covelli improperly expressed an opinion as to whether a reasonable person would have believed that Blanton was armed. Plaintiff admits that the court sustained an objection and struck the answer, but claims that Officer Covelli improperly expressed the same opinion during further testimony. However, at that time, when Officer Covelli was explaining why he feared for his life during the incident, plaintiff did not object. Therefore, plaintiff has waived any objection to such testimony. See *Simmons*, 118 Ill. App. 3d at 684; see also *Gillespie v. Chrysler Motors Corp.*, 135 Ill. 2d 363, 374, 553 N.E.2d 291 (1990).

■ Next, plaintiff argues that Detective Soreghan improperly referred to a weapon in Blanton's hands when he explained why he had the screwdrivers in Blanton's car photographed. Plaintiff acknowledges that the court sustained an objection in that instance also, but asserts that because the detective's response was not stricken from the record, the likelihood of prejudice was sufficient to constitute reversible error. We disagree and find no reversible error in the failure to strike Detective Soreghan's answer from the record.

■ Plaintiff next contends the trial court erred by denying the motions *in limine* to bar evidence that Blanton was under the influence of cocaine at the time of the incident and to bar testimony by O'Donnell about Blanton's mental state. Plaintiff argues that the fact of Blanton's cocaine use was unknown to Officer Covelli at the time of the incident and, therefore, admission of evidence of Blanton's cocaine intoxication at the time of his death constituted prejudicial error.

However, as previously discussed, Officer Covelli's testimony established that he personally observed Blanton engage in behavior that was irrational, erratic, and reckless, and which constituted the commission of various offenses. Such behavior led Officer Covelli to conclude that Blanton was "behaving like a crazy person" and would

support a reasonable inference that Blanton was in some way impaired. Evidence that such behavior was consistent with cocaine intoxication was therefore relevant to support such conclusion and was properly admitted. See *Palmquist*, 111 F.3d at 1341 (reasonable inferences that intoxicants affected decedent's actions were properly admitted). Moreover, in opening argument plaintiff raised the issue of Blanton's cocaine intoxication at the time of the incident and plaintiff's witnesses testified to Blanton's history of cocaine abuse. Accordingly, we find no abuse of discretion in the denial of plaintiff's motion *in limine* to bar evidence of Blanton's cocaine intoxication. *People v. Owen*, 299 Ill. App. 3d 818, 823, 701 N.E.2d 1174 (1998) (ruling on motion *in limine* is within discretion of trial court and will not be reversed on review absent clear abuse of discretion).

■ Finally, plaintiff concedes that O'Donnell was qualified to offer an opinion as to whether Blanton was under the influence of cocaine at the time, but argues that the court abused its discretion by allowing O'Donnell to use "psychological and/or psychiatric terms such as 'paranoia' and 'psychotic.' " O'Donnell, however, did not use those terms to diagnose Blanton as suffering paranoia or psychosis. Rather, O'Donnell testified as to behavioral manifestations of cocaine intoxication, and concluded that the behavior attributed to Blanton, such as the reckless driving and fleeing the police, would be consistent as manifestations of cocaine intoxication. As plaintiff admits, O'Donnell, as an expert pharmacologist, was qualified to testify as to the effects of cocaine. *Cf. In re Wellington*, 34 Ill. App. 3d 515, 519-20, 340 N.E.2d 31 (1975) (testimony of unqualified witness was not prejudicial and therefore, not reversible error). Accordingly, we find no error in the admission of O'Donnell's testimony.

For the above-stated reasons, we affirm the judgment of the circuit court.

Affirmed.

GORDON, P.J., and O'MALLEY, J., concur.